In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2849

Ralph Nawrot,

Plaintiff-Appellant,

v.

CPC International, n/k/a
Bestfoods, Inc., a Corporation,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 630--David H. Coar, Judge.

Argued February 12, 2001--Decided January 11, 2002

Before Cudahy, Rovner, and Williams,
Circuit Judges.

Williams, Circuit Judge. Ralph Nawrot
sued his former employer, CPC
International ("Bestfoods"), claiming
that Bestfoods failed to accommodate
reasonably his disability and
discriminated against him because of his
disability during his employment, and
that his discharge was the product of age
and disability discrimination and
retaliation for seeking accommodation. In
granting summary judgment to Bestfoods,
the district court held that Nawrot could
not show that he was a qualified
individual with a disability under the
Americans with Disabilities Act ("ADA")
and that he had failed to show that
Bestfoods' proffered legitimate,
nondiscriminatory reasons for his
termination were a pretext for
discrimination. Nawrot asks us to reverse
the decision of the district court. We do
so in part. We affirm on pretext, but
reverse on disability, finding that
Nawrot has sufficiently demonstrated that
he is a qualified individual with a
disability under the ADA. We remand for
the district court to resolve whatever
remains of Nawrot's reasonable
accommodation and disability-based
discrimination claims in light of our

decision.

I. BACKGROUND

A. The Facts

Nawrot was hired by Bestfoods in 1976, and he was promoted to warehouse supervisor in 1983. He held that position until he was fired in 1998.

At Bestfoods, Nawrot had problems, which in the beginning were rather modest. In September 1995, he made three remarks to another employee about her religion, Jehovah's Witness, and the following January, he read aloud to his supervisor a list of employee complaints in front of a group of employees. In February and August 1996, he was involved in two arguments with employees, including a supervisor, that escalated into shouting. Nawrot explains these incidents as innocent misunderstandings or completely taken out of context, but does not dispute that they occurred. Bestfoods talked with Nawrot about these incidents, and they were noted in his file. Later, Bestfoods told Nawrot that he had a good rapport with employees, was better than the previous shift supervisor, and his personnel file contained no negative reports.

But his problems continued. On February 19, 1997, Nawrot refused to shake a new employee's hand when he was introduced, saying, "I would shake your hand but I just went to the bathroom and did not wash my hands." As a result of this incident, Nawrot received a formal repri mand, which included a short written reference to his prior conduct and a final warning to him that similar future conduct would result in his termination.

Nawrot had another series of incidents, which had been in the making for some time. For years, he was friends with Margaret Ermalowicz. He even loaned her $3,000 early in 1998, after Bestfoods terminated her for fighting. The relationship seemed to sour around the time Nawrot requested that Ermalowicz pay back the money she borrowed. Adding to the trouble, and in part as a consequence of it, rumors circled around the company about their relationship. Nawrot decided to lay one of the rumors to rest. At a meeting on June 30, 1998, in the presence

of approximately thirty employees, he stated:

I know there's a rumor going around that I was supposedly supposed to have solicited Margaret Ermalowicz for sex. . . . I assure you that is not true. And, as you people know, especially you ones who have been here a while, I never got involved sexually with anybody. . . . [Ermalowicz] is not of my class that I would associate with in any kind of sexual manner.

After the meeting, Nawrot approached Donna Herman and accused her of spreading the rumors. According to Herman, he yelled at her, grabbed her arm and twisted it during this confrontation. She filed two internal complaints against him. Bestfoods interviewed Nawrot, and he admitted making the statement and talking to Herman after the meeting, but denied Herman's other allegations.

But Nawrot's troubles with Ermalowicz were not confined to these incidents. During her unemployment, Ermalowicz and her Union filed a grievance against Bestfoods contesting her termination. Nawrot spoke to Ermalowicz about her grievance and helped her prepare for the arbitration hearing. As a result of arbitration, Ermalowicz was reinstated to her job at Bestfoods. But by the time Ermalowicz was reinstated, July 20, 1998, Nawrot and Ermalowicz were in the midst of resolving several issues in their broken friendship. Nawrot believed she had been spreading the rumor that he solicited her for sex and another rumor that he was stalking her. The day she returned to work, Bestfoods asked them both to stay away from each other. Nawrot did not comply with the request. The very day Bestfoods asked him to avoid Ermalowicz, Nawrot walked by her and sang out loud three times, "I'm stalking my dog and not you" (Nawrot had given Ermalowicz a dog as a gift). Nawrot also drove alongside Ermalowicz, who was walking to her car, and said out of his window, "[W]hen are you going to tell the truth?" Both of these incidents occurred outside of the warehouse and when they were off duty.

The next day, Nawrot sent Ermalowicz a three-page letter, addressing the rumors,

the money he loaned her, and the help he provided her in the arbitration. Two days later, Ermalowicz complained to Bestfoods about Nawrot's behavior, and a week later she complained again, alleging further harassment. Bestfoods investigated the complaint and terminated Nawrot shortly thereafter, because "he was insubordinate, harassed female employees, and demonstrated extremely poor judgment and disloyalty when he helped Ermalowicz prepare her arbitration case."

Nawrot has a different take on his termination. In 1980, he informed Bestfoods that he was a Type I diabetic. Diabetes involves the uncontrolled fluctuation of the blood sugar level in the body. It is a product of the failure of the beta cells of the pancreas to produce sufficient insulin for normal carbohydrate, protein, and fat metabolism, or the failure of the body in general to utilize effectively the insulin produced. Insulin is a hormone; it takes sugar from the bloodstream into the cells of the body for metabolism. Without insulin, sugar remains in the bloodstream, causing severe and potentially fatal consequences.

As a result of his diabetic status, Nawrot must inject himself with insulin approximately three times a day and test his blood sugar level at least ten times a day. Despite his best efforts, Nawrot experiences episodes of hyperglycemia (high blood sugar) and hypoglycemia (low blood sugar), which adversely affect his health, personality, and behavior. In the two years before his termination, he suf fered three diabetic episodes at work. He also had "close calls," in which he felt the onset of a diabetic episode but was able to respond quickly and avert an attack before it caused him significant trouble.

In January 1997, Nawrot's diabetes progressed, and he experienced more difficulty controlling his blood sugar level, which made him more susceptible to hypoglycemia. Nawrot asked his supervisor and the plant human resource manager whether he could take frequent, short breaks to monitor his blood sugar and, if necessary, take measures to adjust his blood sugar level. He needed to take breaks because Bestfoods did not permit eating food on the work floor. Knowing

his diabetic status and the consequences of a failure to manage properly his blood sugar level, Bestfoods rejected this request. Nawrot was not allowed to and did not take breaks. Bestfoods disputes this allegation.

When Nawrot was introduced to the new employee on February 19, 1997, he was suffering from hypoglycemia. What he said, "I would shake your hand but I just went to the bathroom and did not wash my hands," was a product of his disorientation from the hypoglycemia. He later explained to Bestfoods and the new employee that he was having a hypoglycemic episode, and that he was suffering from a bad cold and did not shake the employee's hand because he did not want to pass on any germs. He also submitted a note from his doctor to that effect. After this incident, Nawrot renewed his request to take breaks to monitor better his blood sugar level and requested the ability to cease contact with employees when he sensed the advance of a diabetic episode, but Bestfoods again denied his request.

His ability to control his blood sugar level worsened, and, unable to take breaks at work to help control it, Nawrot requested a leave of absence on February 26, 1997, which Bestfoods approved. Nawrot took this time to monitor his blood sugar level without interruption, attend generally to his health, and prepare to return to work without further incidents.

With his doctor's approval, Nawrot asked to return to work on April 28, 1997. However, Bestfoods would not allow Nawrot to return until June. Bestfoods posted signs with plant security, informing them to keep Nawrot from entering the plant, and they told employees that he was away for psychological reasons. During the leave, Nawrot also requested accommodation for his disability when he returned to work. Bestfoods suggested that Nawrot transfer to the refinery, rather than return to his original position. Nawrot declined this offer, because he knew that the refinery would be closed soon. Bestfoods then suggested that Nawrot take long-term disability leave. Nawrot declined this offer too, because Bestfoods refused to guarantee his return if his disability claim was

denied.

Nawrot returned to work in June 1997, and his supervisor reassigned him from the second shift to the first. The supervisor explained that he needed to watch him. When Nawrot further inquired as to the reasons, he received no reply. Nawrot once again requested discretion to control his diabetes at work, but was again denied. After his third request was denied, Nawrot approached one of the Bestfoods managers he had talked with before about taking breaks. He told the manager that he would be forced to contact the Equal Employment Opportunity Commission ("EEOC"), to which the manager responded that he was not afraid of the EEOC. On April 29, 1998, Nawrot handed a letter to Bestfoods' CEO, who was visiting the plant, which explained his diabetic condition and break requests. He followed up with Bestfoods when he did not receive an answer to his letter, but received no response.

On August 24, 1998, immediately after returning from a two-week vacation, Nawrot was fired. He was 57 years old. Several months later, he was replaced by 40 year old Randy Torres. Nawrot filed a claim with the EEOC under the ADA and the Age Discrimination in Employment Act ("ADEA"), and the EEOC issued a Right to Sue Letter.

B.  District Court Proceeding

Nawrot filed a complaint against Bestfoods in the United States District Court for the Northern District of Illinois. Nawrot's complaint alleged that Bestfoods refused to accommodate his disability and discriminated against him because of his disability, in violation of the ADA. It further alleged that Bestfoods terminated him in retaliation for seeking accommodation of his disability, in violation of both the ADA and Title VII of the Civil Rights Act of 1964 ("Title VII"). Finally, Nawrot's complaint alleged that Bestfoods terminated him on the basis of his disability and on the basis of his age, in violation of both the ADA and the ADEA. Bestfoods moved for summary judgment.

The district court held that Nawrot could not show that he was a qualified

individual with a disability, and therefore granted summary judgment to Bestfoods on Nawrot's ADA accommodation and disability-based discrimination claims. The district court also found that Nawrot had failed to show that Bestfoods' proffered legitimate, nondiscriminatory reasons for his termination were a pretext for discrimination, and granted summary judgment to Bestfoods on all the discriminatory discharge and retaliatory discharge claims. Nawrot appeals.

## II. ANALYSIS

We analyze Nawrot's claims on the two questions that are dispositive of the summary judgment motions, rather than proceeding through each claim individually, because the claims share those questions. We address first whether Nawrot has demonstrated that he is a qualified individual with a disability under the ADA, and second whether Nawrot has demonstrated pretext in Bestfoods' proffered legitimate, nondiscriminatory reasons for his termination.

We review the judgment of the district court, granting summary judgment, de novo. See, e.g., Emerson v. Northern States Power Co., 256 F.3d 506, 510 (7th Cir. 2001). We view the evidence in the light most favorable to Nawrot (the nonmoving party) and make all reasonable, justifiable inferences in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Applying these standards, we hold that Nawrot has sufficiently demonstrated that he is a qualified individual with a disability under the ADA, but that he has not sufficiently demonstrated pretext.

## A. Qualified Individual with a Disability

Nawrot's reasonable accommodation and disability-based discrimination claims under the ADA require that he demonstrate that he is a qualified individual with a disability. See 42 U.S.C. sec. 12112; see also Hoffman v. Caterpillar, Inc., 256 F.3d 568, 571-72 (7th Cir. 2001). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires." 42 U.S.C. sec. 12111(8). Bestfoods concedes that Nawrot can perform the essential functions of his employment position, and therefore we need only consider whether he is disabled. An individual has a "disability" within the meaning of the ADA if she (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. sec. 12102(2).

But not all plaintiffs with health conditions have a "disability" within the meaning of the ADA. See, e.g., Christian v. St. Anthony Med. Ctr., Inc., 117 F.3d 1051, 1053 (7th Cir. 1997) ("The Act is not a general protection of medically afflicted persons."). To claim the protection of the ADA, plaintiffs must come within the coverage of the statutory definition of disability. See Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944, 950 (7th Cir. 2000). Nawrot argues that he is disabled because he meets the first and third statutory definition of disability. We address only his argument under the first definition./1

Nawrot argues that his diabetes is a physical or mental impairment that substantially limits the major life activities of working, thinking, and caring for himself. Although all these major life activities were not explicitly identified to the district court, we believe that these issues were adequately raised below, and that the reasons behind the waiver rule do not require its application in this circumstance. Cf. Bailey v. Int'l Bhd. of Boilermakers, 175 F.3d 526, 529-30 (7th Cir. 1999). We agree with Nawrot that he has demonstrated that his impairment substantially limits his ability to think and care for himself, and so we focus our discussion on these two major life activities./2

In Bragdon v. Abbott, 524 U.S. 624 (1998), the Supreme Court set forth a three-part analysis to determine whether a plaintiff has shown that she is substantially limited in a major life activity, which asks: (1) whether the condition alleged constitutes a physical

or mental impairment, (2) whether that impairment affects a major life activity, and (3) whether the impairment operates as a substantial limit on the major life activity asserted. Id. at 632-42. Moreover, in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), the Supreme Court stated, in answering the third question, that individuals whose impairment "'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken," but "is corrected by medication or other measures" cannot be considered disabled under the statute. 527 U.S. at 482-83. In other words, in applying the statute to specific impairments, courts may consider only the limitations of an individual that persist after taking into account mitigation measures (e.g., medication) and the negative side effects of the measures used to mitigate the impairment. See id.; see also Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521 (1999).

This is not, however, license for courts to meander in "would, could, or should-have" land. We consider only the measures actually taken and consequences that actually follow. Cf. Sutton, 427 U.S. at 482-84 (reasoning that an "approach [that] would often require courts and employers to speculate about a person's condition and would, in many cases, force them to make a disability determination based on general information about how an uncorrected impairment usually affects individuals, rather than on the individual's actual condition" is "contrary to the letter and the spirit of the ADA"). Those who discriminate take their victims as they find them.

Nawrot is a diabetic./3 But his diabetic status, per se, is not sufficient to qualify as a disability under the ADA. See id. at 483; Lawson v. CSX Transp., Inc., 245 F.3d 916 (7th Cir. 2001). In Moore v. J.B. Hunt Transport, Inc., supra, we reiterated that "[s]ome impairments may be disabling for particular individuals but not others, depending upon the stage of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors." Id. at 952 (quotingHomeyer v. Stanley Tulchin Assocs., Inc., 91 F.3d 959, 962 (7th Cir. 1996)). To be substantially limiting, the

impairment must make the individual "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 CFR sec. 1630.2(j); see also Sutton, 527 U.S. at 480.

However, Nawrot's claim does not rest solely on his diabetic status. He also points out that as a consequence of his diabetes, he must inject himself with insulin approximately three times a day and must test his blood sugar level at least ten times a day. In addition, although he is able to manage his diabetes with constant monitoring and insulin injections (itself a substantial burden), this hardly remedies all the other adverse effects of his diabetes.

Despite the most diligent care, Nawrot cannot completely control his blood sugar level. He suffers from unpredictable hypoglycemic episodes, of such extreme consequence that death is a very real and significant risk. On the occasions he suffers from such an episode, his ability to think coherently is significantly impaired, as well as his ability to function. He has lost consciousness and fallen several times. In addition, his ability to express coherent thoughts is impaired, causing him to make nonsensical statements. He suffered three diabetic episodes at work in the two years before his termination. And aside from full-blown diabetic episodes, Nawrot has had "close calls," where he felt the onset of an episode but was able to avert a serious, debilitating attack.

Moreover, Nawrot's diabetes has progressively worsened. His difficulties became so overwhelming that in February 1997, he took medical leave to care for his physical health and attend to his diabetes management. By April 1997, his doctor described his diabetes as "brittle" and therefore "very likely that he [will develop] hypoglycemic attacks." Physically, Nawrot has already suffered early stages of kidney damage and nerve damage in his feet as a consequence of

his diabetes. His nerve damage is so extensive that it has affected his ability to sense feeling in his feet. Furthermore, Nawrot is on a restrictive diet, and depression and mood changes accompany his swings in blood sugar level.

Bestfoods argues, however, that this is not enough. They argue that these facts fail to demonstrate a "substantial" limitation on any "major life activity." We simply cannot agree. Instead, we are convinced that Nawrot has sufficiently demonstrated that his diabetes substantially limits his ability to think and care for himself, which are both major life activities. See, e.g., Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 307-11 (3d Cir. 1999).

B.   McDonnell Douglas and Pretext

Having resolved the disability question in Nawrot's favor, we now turn to the issue of pretext. All of Nawrot's discharge-related claims against Bestfoods--discriminatory discharge on the basis of both age and disability, and retaliatory discharge for seeking accommodation--suffer the same fatal infirmity: Nawrot is unable to rebut Bestfoods' proffered legitimate, nondiscriminatory reasons for the discharge as a pretext for discrimination. Nawrot does not allege direct evidence of intentional discrimination, but rather advances his claims under the "indirect burden-shifting method" established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of intentional discrimination. Once the plaintiff establishes a prima facie case, a legal, rebuttable presumption of discrimination arises, and a burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. If the employer satisfies that burden, the presumption of discrimination extinguishes, and the burden shifts back to the plaintiff to persuade the trier of fact either directly that a discriminatory reason more likely motivated the action or

indirectly that the employer's articulated reason for the employment action is unworthy of credence, but a mere pretext for intentional discrimination. See, e.g., Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-56 (1981).

At all times, the ultimate burden of persuasion remains with the plaintiff. Id. at 253. Indeed, in the third stage, the plaintiff's "burden" under the McDonnell Douglas framework "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." Id. at 256; see also United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-15 (1983). At this point the McDonnell Douglas framework, with its presumptions and shifting burdens, is no longer relevant, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510 (1993); the third step simply returns the plaintiff to the position she was in originally, i.e., proving intentional discrimination. See Hicks, 509 U.S. at 511 (stating that the McDonnell Douglas framework "simply drops out of the picture").

Although this court has stated that the prima facie case must be established and cannot be merely "incanted," Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1178 (7th Cir. 1997), "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." Aikens, 460 U.S. at 715 (italics in original). As we have before, we elect to turn directly to pretext./4 See, e.g., Olsen v. Marshall & Ilsley Corp., 267 F.3d 597, 600 (7th Cir. 2001). Indirectly showing intentional discrimination by rebutting the employer's reasons as pretext was not the only option available to Nawrot to establish a triable case under the McDonnell Douglas framework. See Burdine, 450 U.S. at 256; see also generally Aikens, 460 U.S. at 714 n.2. However, that is the path Nawrot has chosen.

Without direct evidence of pretext (e.g., an admission), a plaintiff may show pretext by presenting evidence "tending to prove that the employer's

proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." Testerman v. EDS Technical Prods. Corp., 98 F.3d 297, 303 (7th Cir. 1996); Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1133 (7th Cir. 1994). But pretext requires more than a showing that the decision was "mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown." Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000); see also O'Connor v. DePaul University, 123 F.3d 665, 671 (7th Cir. 1997) ("On the issue of pretext, our only concern is the honesty of the employer's explanation . . . ."). We have warned repeatedly that we do not sit as a super-personnel department that reexamines an entity's business decision and reviews the propriety of the decision. See, e.g., Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000); Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986). With that admonishment, however, we have also stated that "we need not abandon good reason and common sense in assessing an employer's actions." Gordon v. United Airlines, Inc., 246 F.3d 878, 889 (7th Cir. 2001).

Turning to this case, Nawrot has not demonstrated pretext in Bestfoods' proffered legitimate, nondiscriminatory reasons for his termination. Bestfoods states that it terminated Nawrot because he harassed his co-worker, Ermalowicz, after having been specifically warned against contact with her, and after a formal reprimand and final written warning. In addition, Nawrot provided assistance to Ermalowicz in her arbitration against Bestfoods, disregarding his position as a manager in (and thus loyalty to) the company. Nawrot responds that the handshake incident, for which the final warning issued, was a product of his disability and that he could not be punished for his disability. But he forgets all of his prior misconduct--his remarks about Jehovah's Witnesses, criticism of his supervisor in front of employees, arguments that escalated into shouting, statements about Ermalowicz in front of employees, and confrontation with a co-worker after those statements. Plus, he was actually terminated for harassing and stalking

Ermalowicz and aiding her in the arbitration against Bestfoods.

Nawrot disputes the factual bases for all the incidents, and argues that they could not have provided the basis for his termination. But all of his arguments are no more than his own self-serving interpretations of the incidents or denials that they ever occurred. They do not address whether Bestfoods honestly disbelieved his explanations and denials, even if incorrectly, or whether its determination that the incidents warranted termination were honestly held. And, it is Bestfoods' belief that matters.

After numerous documented occasions of inappropriate behavior, Bestfoods demanded that Nawrot straighten up and fly right, and instead he crashed and burned. He decided to harass Ermalowicz, despite Bestfoods' request that he not have any contact with her. Nawrot says that his harassment of her did not occur at work. But why should that matter? It is up to Bestfoods to decide whether harassment of co-workers anywhere is conduct it is willing to accept from its employees. We need not be human resource specialists to know that problems outside of work easily spill over into and affect employees at work, as it did in this case. Bestfoods need not tolerate an employee who has a history of inappropriate conduct and who, despite its warning, purposefully continued to aggravate an already uneasy situation with his co-worker. We believe that Nawrot has failed to rebut Bestfoods' legitimate, nondiscriminatory reasons for his termination as a pretext for discrimination.

C.  Remaining Issues

Nawrot has also alleged that Bestfoods failed to accommodate reasonably his disability and discriminated against him because of his disability during his employment. These issues were never fully addressed by the district court on summary judgment, because its conclusion that Nawrot was not disabled under the ADA made any further review of them unnecessary. Also, the parties did not brief these issues to this court, but only challenged the district court's decision on disability. Rather than take

these issues without the benefit of any discussion, we believe they should be reviewed by the district court on remand.

III.  CONCLUSION

   For the foregoing reasons, we Affirm in part and Reverse in part the judgment of the district court, and Remand the case for further proceedings.

FOOTNOTES

/1 Nawrot has failed to present sufficient evidence to support the argument that Bestfoods regarded him as disabled, under the third statutory definition. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999). He merely speculates that Bestfoods "fear[ed] that he was psychotic when he suffered [sic] hypoglycemia." The evidence he presented does not reflect a misperception by Bestfoods that Nawrot's impairment substantially limited a major life activity.

/2 Nawrot has failed to identify a class of jobs or a broad range of jobs from which he is excluded and therefore cannot show that he is substantially limited in the major life activity of working. See, e.g., EEOC v. Rockwell Int'l Corp., 243 F.3d 1012, 1017 (7th Cir. 2001).

/3 Bestfoods does not dispute that diabetes qualifies as an impairment under the ADA.

/4 We do not intend, however, to minimize the value of this court at times, and district courts always, addressing the prima facie case, see generally Jayasinghe v. Bethlehem Steel Corp., 760 F.2d 132, 134 (7th Cir. 1985) (discussing the screening value of the prima facie case to weed out meritless cases early), and we agree with our precedent that stresses its importance, see, e.g., Gorbitz v. Corvilla, Inc., 196 F.3d 879, 882 (7th Cir. 1999).