In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3533

GARY M. DYREK,

*Plaintiff-Appellant*,

*v.*

JANE GARVEY, Administrator,
Federal Aviation Administration,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 6314—**George W. Lindberg**, *Judge*.

ARGUED FEBRUARY 21, 2002—DECIDED JUNE 20, 2003

Before FLAUM, *Chief Judge*, and HARLINGTON WOOD, JR.
and WILLIAMS, *Circuit Judges*.

HARLINGTON WOOD, JR., *Circuit Judge*.  Appellant Gary
Dyrek was employed by the Federal Aviation Administra-
tion ("FAA") as an Air Traffic Control Specialist ("ATCS").
FAA Air Traffic Control Specialists, also known as air
traffic controllers, are responsible for directing air traffic,
both on the ground and in the air. It is their duty to pro-
vide for the safe, orderly, and expeditious flow of air
traffic across U.S. airspace. FAA rules and regulations
require an air traffic controller to maintain a valid medical
certificate to minimize the effects of health concerns on
system safety.

Dyrek began working as an air traffic controller in 1981. During the time he worked at the FAA, Dyrek's work performance was never criticized. However, by letter dated March 14, 2000, Dyrek was informed he was being terminated from his position effective March 17, 2000, "because of [his] inability to meet medical standards required for Air Traffic Control Specialists." This termination letter was the culmination of nearly three years of discussions between Dyrek and the FAA regarding his health. In October 1993, Dyrek was diagnosed as having diabetes mellitus. In May 1997, Dyrek began taking daily injections of insulin for his diabetes. While the mere diagnosis of diabetes mellitus is a disqualifying condition for initial hire as an air traffic controller, an air traffic controller who becomes an insulin-using diabetic while employed by the FAA may maintain his or her medical certificate through "special consideration."[1]

By a letter dated June 30, 1997, the Regional Flight Surgeon's office temporarily withdrew Dyrek's medical clearance for safety-related duties, based on a review of a medical report from Dyrek's attending physician dated June 13, 1997 which stated Dyrek had been placed on insulin for his diabetes. According to the Regional Flight Surgeon's letter, laboratory results indicated unsatisfac-

---

[1] As we will discuss in more detail in our opinion, a medical clearance based on special consideration is granted based on a favorable review of an ATCS's medical history and a comprehensive medical evaluation. The ATCS must also demonstrate stable control of his diabetes through proper diabetes education and skills. If medical clearance is granted based on special consideration, the ATCS, his supervisors, and his coworkers must adhere to strict FAA guidelines throughout the workday to ensure the ATCS is maintaining stable control of his blood sugar to prevent dangerous diabetic complications that might interfere with air safety.

tory control of Dyrek's diabetes. The Regional Flight Surgeon requested a comprehensive medical report from Dyrek's attending physician to assist in the assessment of Dyrek's medical status. The letter stated that the medical report should contain information concerning medications, Dyrek's current status, the doctor's prognosis and recommendations, the treatment regimen, and results of any tests performed. Enclosed with the letter was a form authorizing payment by the FAA for the writing of the report.

When Dyrek's medical clearance was withdrawn, he was assigned to perform only limited "A-side duties." "A-side duties" do not include any responsibility for air traffic control, and a medical clearance is not required in order to perform "A-side duties." Prior to 1995, the FAA had "A-side positions" in which individuals performed only "A-side duties." This "A-side position" was a separate position from that of air traffic controller. However, "A-side positions" were abolished by the FAA in 1995. Currently, air traffic controllers are required to perform "A-side duties" as a part of their job. The FAA and the National Air Traffic Controllers Association have an agreement that allows the FAA to assign air traffic controllers who are temporarily medically disqualified to perform only "A-side duties," which allows those air traffic controllers to continue working despite their lack of medical clearance.

According to the deposition testimony of Deputy Regional Flight Surgeon Dr. Robert Liska, prior to 1995, there were no insulin-using diabetic air traffic controllers who were medically certified to work in safety-related positions. However, the FAA periodically issued Medical Guideline Letters setting out medical protocols which would allow for certification of insulin-using air traffic controllers. These protocols were designed to collect and interpret information on a case-by-case basis and set forth standards to help the Regional Flight Surgeons in

understanding whether an insulin-using individual was "safe" to perform safety-related air traffic control duties. For example, Medical Guideline Letter MGL-B-86, titled "Medical clearance; diabetic air traffic control specialists who use insulin" stated, "Clearance may be granted and shall be based on the medical history, on the results of a comprehensive medical evaluation, on documentation of proper education regarding diabetes, and on consideration of the diabetes control skills demonstrated by each subject ATCS." According to MGL-B-86, "Continued clearance requires control of diabetes with prevention of hypoglycemia through close monitoring and maintenance of appropriate blood glucose levels throughout every work day."

In 1997, Medical Guideline Letter MGL-B-5a-0026, titled "Guidance for Application of Medical Retention Standards for Air Traffic Control Specialists," was in effect. With respect to diabetes mellitus, MGL-B-5a-0026 states recurrent evidence of noncontrol, including blood sugar test results showing elevated Hemoglobin A1C ("A1C") levels and elevated fasting blood sugar ("FBS") levels, are grounds for disqualification. According to MGL-B-5a-0026, A1C levels at twelve percent or higher indicate uncontrolled diabetes while A1C levels of six to seven percent indicate excellent diabetes control.[2]

In response to the June 30, 1997 letter withdrawing his medical clearance, Dyrek submitted a medical report dated July 15, 1997 from his endocrinologist Dr. Steven Bielski. By memo dated July 24, 1997, the office of the Regional Flight Surgeon notified Dyrek that, based on information contained in Dr. Bielski's July 15th report, it had been determined that Dyrek's diabetes was "not well

---

[2] An A1C test gives a long-term measure of how well a diabetic's blood sugar has been controlled.

controlled." The memo stated once Dyrek "established stable control" of his diabetes, he would need to submit "a narrative medical report from [his] attending physician" documenting control. It set out six specific areas which needed to be addressed in the report—diagnosis, medications, current status, prognosis and recommendations, treatment regimen, and results of any tests performed.

On April 24, 1998, the office of the Regional Flight Surgeon again contacted Dyrek by memo. The memo read as follows:

> We recently received your most recent physical examination dated March 31, 1998, which indicates that you are using insulin to control your diabetes.

> Your medical clearance for safety related duties was temporarily withdrawn on June 30, 1997, for unsatisfactory control of your diabetes mellitus. At this time your medical clearance remains in that status.

> In our two previous correspondence dated July 24, 1997 and June 30, 1997, we requested additional medical information. As of this date we have not received this information and are unable to determine your medical clearance for safety related duties.

> Please provide the medical information requested within 30 days from the date of this memorandum. For your convenience we have attached a copy of the previous requests along with a return envelope. If you have any questions regarding this matter please contact our office at the number listed above.

Several months later, the office of the Regional Flight Surgeon sent Dyrek another memo, dated August 19, 1998, which stated,

> Your medical clearance was withdrawn June 30, 1997 because of diabetes mellitus which now requires insulin for control.

We received a medical report from Steven J. Bielski, M.D. dated May 21, 1998. In this report Dr. Bielski said he was adjusting your medication.

To assist us in determining your medical status regarding the above, we will need a medical report from your attending physician. This report is due within 30 days, and should include the following:

1. Diagnosis
2. Medication (to include name, dosage, frequency and any adverse effects you may have experienced)
3. Current Status
4. Prognosis and recommendations
5. Treatment Regimen
6. Results of any x-rays or other tests performed.

Please ask your attending physician to include the results of your most recent FBS and Hemoglobin A1C.

Attached is FAA form 3930-3 authorizing payment for the writing only of the medical report. A self addressed envelope is also attached for the doctor's convenience.

If you have any questions regarding this matter, please feel free to contact this office.

Dyrek received another short memo from the Regional Flight Surgeon dated September 23, 1998. The September 23rd memo stated, as of that date, the office had not received either a medical report or lab results from Dyrek's most recent FBS and A1C tests. The memo asked Dyrek to provide the information within fifteen days and stated that without the requested information the FAA was unable to determine Dyrek's medical status for air traffic control duties.

Deputy Regional Flight Surgeon Liska met with Dyrek on October 22 and December 1, 1998 to discuss control of

Dyrek's diabetes. Dr. Liska informed Dyrek that the medications he was taking, a combination of Rezulen and insulin, were not acceptable for a medical clearance. By memo dated December 1, 1998, Dr. Liska again requested a medical report including diagnosis, medication, current status, prognosis and recommendations, treatment regimen, and the results of any x-rays or other tests performed. Dr. Liska met with Dyrek on January 15, 1999. That meeting was documented by Dr. Liska in a memo to Dyrek dated January 28, 1999. According to the January 28th memo, Dyrek informed Dr. Liska at the January 15th meeting that Dyrek had discontinued his use of Rezulen. Dyrek asked for additional time to document control of his blood sugar without Rezulen. In the January 28th memo, Dr. Liska requested "an interval summary and current status report from [Dyrek's] attending physician about sixty days after discontinuation of Rezulen regarding control of [his] diabetes." According to the memo, the report, which was due no later than March 9, 1999, should include current A1C results.

Dr. Liska sent another memo to Dyrek on March 18, 1999. This memo instructed Dyrek to submit, among other things, "a complete medical evaluation by a Board Certified/Board Eligible Endocrinologist or other diabetes specialist approved by the Federal Air Surgeon concerning your medical history and current status." According to Dr. Liska's memo, the report must include, at the minimum, a general physical examination, A1C results both current and three months prior, confirmation from an ophthalmologist of the absence of clinically significant retinal disease, examination and tests to detect any peripheral neuropathy or circulatory deficiencies of the extremities, and a detailed report of insulin dosages and diet. Dr. Liska stated the office had A1C readings for Dyrek dated December 14, 1998 and March 5, 1999. Dyrek was also instructed to submit written verification from

the specialist confirming Dyrek had been educated in diabetes and its control and that Dyrek had the ability and willingness to properly monitor and manage his diabetes. The memo also asked that the specialist submit his opinion as to whether Dyrek's diabetes would adversely affect his ability to safely control air traffic. Dr. Liska did not set a deadline for Dyrek to submit this information, but concluded by stating, "Your prompt attention to this matter is appreciated."

On April 16, 1999, Dr. Liska sent another memo to Dyrek with the subject line "Request for Medical Information." Dr. Liska stated he had not received the information requested in the March 18th memorandum and attached a copy of the March 18th memo for Dyrek's convenience. On April 22, 1999, Ralph Davis, Dyrek's supervisor and the Air Traffic Manager for the Chicago center, sent Dyrek a memo noting Dyrek had been informed he was required to comply with certain tasks in order to be considered for medical requalification and stating that failure to comply with these requirements could result in disciplinary action. Finally, on May 3, 1999, the Regional Flight Surgeon sent a memo to Human Resource Services stating Dyrek had been determined to be "permanently medically disqualified for the continuing performance of ATCS duties."

On May 20, 1999, Dyrek received a memo from Human Resource Services, notifying him of the medical disqualification. The memo instructed Dyrek that he had fifteen days to request reconsideration from the Federal Air Surgeon of the Regional Flight Surgeon's determination and set out the procedures for doing so. The memo also stated,

> It is the policy of the FAA, to the extent possible, to continue employment of Air Traffic Control Specialists who are found to be not medically qualified for their present position. You may be considered for other types

of available vacancies for which you qualify within the commuting area. It is essential that you complete GL Form 3330-50 within the fifteen day period and forward along with a current SF-171 or OF-612, through your facility manager to AGL-18A.

Dyrek requested a review of the medical determination by the Federal Air Surgeon on June 5, 1999. He did not ask to be considered for other available FAA positions or take any of the steps necessary for continued employment within the fifteen day period as outlined in the May 20th memo.

A review panel, made up of doctors from the FAA's Occupational Health Division, considered Dyrek's case in order to make a recommendation to the Federal Air Surgeon regarding Dyrek's medical status. On December 16, 1999, the review panel issued a memo recommending that the Federal Air Surgeon sustain Dyrek's medical disqualification. The panel noted, "Insulin treated diabetes is of particular concern in the air traffic control environment due to the potential for acute hypoglycemia induced central nervous system impairment" as well as chronic complications involving the eyes, heart, kidneys, nervous system, and extremities. The panel concluded (1) Dyrek had insulin treated diabetes, a disqualifying medical condition, (2) the documentation included in Dyrek's agency medical record did not meet the minimum requirements to support a recommendation of "Special Consideration," (3) "[b]ased on the records provided by Mr. Dyrek, his diabetes is not well controlled," and (4) "[n]o basis was found . . . to preclude future reconsideration by the Federal Air Surgeon, if Mr. Dyrek adequately monitors and controls his diabetes, and provides sufficient documentation in compliance with each requirement of MGL-B-86." By letter dated December 21, 1999, the Federal Air Surgeon informed Dyrek that he was sustaining Dyrek's disqualification.

On January 3, 2000, Dyrek informed the Occupational Health Division that he intended to submit additional material. Dyrek subsequently faxed the office some medical updates, including information suggesting Dyrek was just learning that there is a relationship between diet and blood glucose.

On February 14, 2000, Air Traffic Manager Ralph Davis sent Dyrek a letter titled "Proposal to Remove." The stated purpose of the letter was to inform Dyrek that Davis was proposing to remove Dyrek from his Air Traffic Control Specialist position based on Dyrek's inability to meet the medical standards required for the position. The letter invited response by Dyrek within fifteen days after receipt of the letter. Dyrek did respond by letter dated February 27, 2000. Dyrek requested reconsideration based on new documentation. Dyrek enclosed his blood sugar/calorie count readings for January and February 2000, along with charts outlining insulin dosages for those months. Dyrek also included a letter from Dr. Bielski, dated February 10, 2000, which read as follows:

> Gary Dyrek is currently a patient of mine. He has diabetes mellitus type 2, requiring insulin. He currently underwent a complete physical examination. His blood pressure was 132/82. The chemistry panel revealed a total cholesterol of 174 and LDL cholesterol 112.
>
> Currently Gary is on insulin therapy in the morning and at bedtime. We have also added Glucophage. He has lost approximately 19 pounds in weight over the last several months. His current hemoglobin A1C is 8.9%, which is the lowest it has been over the last several years. The patient has been monitoring his glucose levels. He has been watching his calories and has been losing weight on his own with diet. Currently there is no evidence of the diabetes affecting his eyes or his kidneys.

Please do not hesitate to contact me if you have any further questions.

Dyrek also submitted a handwritten note from the Aurora Eye Clinic dated February 3, 2000. The note stated Dyrek was seen in the office on that day, his vision was 20/20 in both eyes, and there was no sign of diabetic retinopathy. Dyrek sent copies of this supplemental information to the Federal Air Surgeon on March 2, 2000.

On March 14, 2000, the Occupational Health Division review panel issued another recommendation to the Federal Air Surgeon regarding Dyrek's medical classification. This recommendation followed a second review of Dyrek's medical record including the additional information submitted March 2nd. The panel concluded "[b]ased on available records, until very recently Dr. [sic] Dyrek's diabetes was poorly controlled," "[d]uring 1998 and 1999, Mr. Dyrek failed to provide . . . adequate documentation to support a request for special consideration," "[t]he currently available documentation can not support a conclusion that Mr. Dyrek has achieved stable diabetic control," and "[i]f Mr. Dyrek adequately monitors and controls his diabetes for a period of not less than six months" he should submit for reconsideration. By letter dated March 15, 2000, a medical officer from the Occupational Health Division informed Dyrek that the blood sugar readings in his additional submissions still did not demonstrate adequate stable diabetic control. The letter informed Dyrek that he erred in directing his February 27th letter to the Federal Air Surgeon as the Federal Air Surgeon does not make employment decisions regarding air traffic controllers, but rather deals only with medical clearance. The letter concluded, "Should you choose to resubmit for medical clearance in the future, you will need to provide glucose logs demonstrating good control of your diabetes for a period of at least six months, a reasonable under-

standing of the disease, and documentation meeting the requirements of MGL-B-86."

Meanwhile, the Regional Air Surgeon notified Ralph Davis that there was nothing in the supplemental materials that would change Dyrek's medical status. Therefore, on March 14, 2000, Davis issued his "Decision Letter" to Dyrek, stating he had considered Dyrek's additional submissions, but nevertheless concluded Dyrek should be removed effective March 17, 2000. In a letter dated March 17, 2000 to Ralph Davis, Dyrek requested assignment to any available staff position in the Chicago center or the commuting area. While Davis, in his deposition, stated that he considered this request to be timely, Dyrek did not receive another placement. It is undisputed that Dyrek's possible assignment to another position was dependant on the existence of a vacancy in a position that did not require a medical clearance. In his deposition, Ralph Davis testified there were no such vacancies at the Chicago center in March 2000.

Following his termination, Dyrek filed both a union grievance and an Equal Employment Opportunity ("EEO") complaint. However, air traffic controllers are precluded by a collective bargaining agreement from pursuing both a union grievance and an EEO complaint. Therefore, the U.S. Department of Transportation dismissed Dyrek's EEO complaint without addressing its merits due to the pending union grievance.

On October 12, 2000, Dyrek filed a two-count complaint in the United States District Court for the Northern District of Illinois against the FAA and FAA Administrator Jane Garvey ("the FAA"). Count I alleged the FAA unlawfully discriminated against Dyrek because of his diabetes in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1277, and Title VII of the Civil Rights

Act of 1991, 42 U.S.C. § 2000e, *et seq.*[3] Count II alleged a violation of the Age Discrimination and Employment Act, 29 U.S.C. § 621, *et seq*. The defendants filed a motion for summary judgment pursuant to FED. R. CIV. P. 56. Dyrek elected not to pursue his age discrimination claims and did not contest defendants' motion with respect to Count II. On August 30, 2001, the district court granted summary judgment in favor of the defendants. With respect to Dyrek's disability discrimination claims, the court held that Dyrek failed to establish the FAA's proffered reason for the withdrawal of Dyrek's medical clearance and his subsequent termination was pretextual.

## ANALYSIS

We review the district court's grant of summary judgment *de novo*. *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000). Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In our

---

[3] While the ADA does not apply to federal agencies, *see* 42 U.S.C. § 12111(5)(B), the standards set out in the ADA are used in determining whether a violation of the Rehabilitation Act occurred in the employment context. 29 U.S.C. § 794(d).

analysis, we view the evidence in the light most favorable to Dyrek, the non-moving party, and draw all reasonable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Lacking direct evidence of discrimination, Dyrek proceeds under the burden-shifting approach set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, Dyrek bears the initial burden of establishing a prima facie case of employment discrimination. *See Pugh v. City of Attica, Indiana*, 259 F.3d 619, 625 (7th Cir. 2001). If Dyrek is able to establish his prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the FAA to articulate a legitimate, nondiscriminatory reason for Dyrek's termination. *See id.* at 626. If the FAA meets this burden, the presumption of discrimination disappears, and Dyrek must prove, by a preponderance of the evidence, that the FAA's proffered reason was a pretext for intentional discrimination. *See id.*

For purposes of analysis, we will assume Dyrek is able to establish a prima facie case of employment discrimination, and we turn our attention to the FAA's proffered reason for Dyrek's termination. *See Nawrot v. CPC Int'l*, 277 F.3d 896, 906 (7th Cir. 2002) (electing to turn directly to the question of pretext). The FAA contends Dyrek was terminated because he failed to submit documentation to establish his diabetes was under control, despite numerous requests for specific information. Dyrek does not dispute appellees' right to require that he control his diabetes, nor does he challenge the FAA's heightened medical reporting requirements for insulin-using diabetics. Rather, he asserts appellees' proffered reason for his termination is pretextual, first, because there is no evidence in the record to show he was not controlling his diabetes and, secondly, because his diabetes was actually under control.

Absent direct evidence of pretext, Dyrek may show the FAA's proffered reason for his termination was pretextual by pointing to evidence which would tend to prove the proffered reason was factually baseless, not the actual motivation for the discharge, or insufficient to motivate the discharge. *Nawrot*, 277 F.3d at 906. It is not enough to show the decision was "'mistaken, ill considered, or foolish.'" *Id*. (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)). This court does not sit as a super-personnel department; our only concern with respect to pretext is the honesty of an employer's explanation. *Id*.

Dyrek contends the deposition testimony of Dr. Liska should be viewed as "an admission that the FAA was on notice that Dyrek was controlling his diabetes." The testimony cited by Dyrek deals with the guidelines set out in MGL-B-5a-0026 regarding A1C test results. Dr. Liska testified that, according to MGL-B-5a-0026, A1C values of twelve percent or higher indicate uncontrolled diabetes. Counsel for Dyrek asked Dr. Liska whether Dyrek ever reported an A1C result with a value of twelve percent or higher to which Dr. Liska replied, "Not to my knowledge." This is far from an admission that Dyrek was controlling his diabetes. As was made clear from the numerous memos sent to Dyrek by the FAA, A1C test results were just one component of the comprehensive medical information documenting control that was requested. The FAA also requested results from a general physical examination, a detailed report of Dyrek's insulin dosages and diet, verification that Dyrek had been educated in diabetes and its control and was willing and able to properly monitor and manage his diabetes, and a statement by Dyrek's specialist as to whether his diabetes would adversely affect his ability to safely control air traffic.

When asked at oral argument why Dyrek failed to provide the FAA with the requested documentation, counsel for Dyrek stated it was his belief that Dyrek's February 2000 submissions were sufficient to satisfy the FAA's request for a medical report. However, an examination of those submissions, which are included in the record, shows that they do not provide all of the information requested by the FAA. The note from the Aurora Eye Clinic could satisfy the request for confirmation by an ophthalmologist of the absence of retinal disease. Dr. Bielski's half-page letter, however, while containing some of the requested information, cannot be construed as a comprehensive medical report. With respect to the blood sugar charts for January and February 2000, Dr. Liska testified that he was not able to interpret these charts and pointed out specific portions of the charts that were unclear. Dyrek was given many opportunities to provide specific documentation, yet he failed to do so. His February 2000 submissions came nearly one year after he had been permanently medically disqualified and two months after that disqualification was sustained on appeal by the Federal Air Surgeon. The FAA nevertheless considered the submissions in a second panel review. As the panel noted, while the new submissions may indicate Dyrek's diabetes was under control at that point, there is nothing to demonstrate stable control over a period of time.

Dyrek further contends his case of discrimination is bolstered by the fact he was not given another position within the FAA that did not require a medical clearance. We first address Dyrek's contention that "the position [he] held at the time he was fired" did not require a medical clearance. It is undisputed that the air traffic controller position requires a valid medical clearance. While "A-side duties" may be performed without a valid medical clearance, the record evidence clearly shows at the time Dyrek was terminated there was not a separate "A-side position"

within the FAA. Furthermore, Dyrek concedes his assignment to another position was dependant upon the existence of a vacancy in a position that did not require a medical clearance, yet in his briefs on appeal he points to no evidence that could show such a vacancy existed at the time he made his request for an alternate assignment. At oral argument, counsel for Dyrek, without citation to the record, stated there was an open Quality Assurance position at the time Dyrek requested reassignment. A review of the record does not support this assertion. Ralph Davis, in his deposition, testified that, at the time of Dyrek's request, there were positions at the Chicago center for which Dyrek was qualified, including Regional Specialists, Quality Assurance, and Instructors, that did not require medical clearance. However, Davis clearly testified that in March 2000 there were no vacancies in these positions at the Chicago center. Viewed in the light most favorable to Dyrek, there is no evidence from which a reasonable trier of fact could conclude the FAA's proffered reason for Dyrek's termination was pretextual. The district court's grant of summary judgment is AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
