**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MONTE J. HUKILL,
Plaintiff-Appellee,

v.

No. 98-1969

AUTO CARE, INCORPORATED;
MCGILLICUDDY & ASSOCIATES;
WILLIAM MCGILLICUDDY,
Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-97-1567-A)

Argued: April 8, 1999

Decided: September 22, 1999

Before ERVIN,* HAMILTON, and LUTTIG, Circuit Judges.

_____

Vacated and remanded with instructions by published opinion. Judge
Hamilton wrote the opinion, in which Judge Ervin and Judge Luttig
joined.

_____

*Judge Ervin participated in the consideration of this case but died
prior to the time the decision was filed. The decision is filed by a quorum
of the panel pursuant to 28 U.S.C. § 46(d).

**COUNSEL**

**ARGUED:** John Michael Bredehoft, VENABLE, BAETJER &
HOWARD, L.L.P., McLean, Virginia, for Appellants. Michaele Sny-
der Battles, KIBLAN & BATTLES, McLean, Virginia, for Appellee.
**ON BRIEF:** Garald M. Bowen, GERALD M. BOWEN LAW
OFFICES, McLean, Virginia, for Appellants.

_____

**OPINION**

HAMILTON, Circuit Judge:

Monte Hukill (Hukill) brought this action against the defendants,
William McGillicuddy (McGillicuddy), McGillicuddy Associates,
Inc. (MAI), and Auto Care, Inc. (ACI), alleging that the defendants
violated the Family and Medical Leave Act (FMLA), see 29 U.S.C.
§§ 2601-2654, when the defendants refused to reinstate him in his for-
mer position with MAI upon his return from a leave of absence for
a surgical procedure. Prior to trial, the district court held that, even
though the defendants, individually or collectively, employed less
than fifty employees during the period relevant to Hukill's FMLA
claims, it had subject matter jurisdiction over Hukill's FMLA claims
because the defendants and several corporations constituted an "inte-
grated employer," 29 C.F.R. § 825.104(c)(2), and, therefore, the
defendants were employers under the FMLA. Following a jury trial,
the jury found in Hukill's favor. Judgment was entered in favor of
Hukill in the amount of $17,825 on his FMLA claims, and the district
court also awarded costs and attorney's fees in the amount of
$56,545.97. On appeal, the defendants principally contend that the
district court lacked subject matter jurisdiction over Hukill's FMLA
claims. We agree. Accordingly, we vacate the district court's judg-
ment and remand with instructions to dismiss the case for lack of sub-
ject matter jurisdiction.

I

A

MAI, a Virginia corporation, owns and operates an automotive ser-
vice station in Burke, Virginia. McGillicuddy owns 100% of MAI's
stock.

McGillicuddy also owns 50% percent of the stock in seven other Virginia corporations.[1] Three of these corporations, King's Park Auto Care, Inc. (KPAC), Willston Center Auto Care, Inc. (WCAC), and Vienna Auto Care, Inc. (VAC), operate automobile service stations. Three others, Arlington Auto Care, Inc. (AAC), West Springfield Automotive, Inc. (WSA), and Burke Center Goodyear, Inc. (BCG), operate Goodyear tire centers. The seventh corporation, ACI, provides contract administrative services to MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG. More specifically, ACI provides the following services to these corporations: (1) payroll services, with each payroll account being maintained separately; (2) bookkeeping services, with each set of books being maintained separately; (3) the administration of a health care plan, with individual accounts for each corporation being maintained separately; (4) issuance of various policy statements (e.g., substance abuse policy) applicable to each corporation; and (5) a secure site for the maintenance of personnel records.

McGillicuddy is president of ACI, MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG, and functions on a day-to-day basis as the chief executive officer of these corporations. His office is at ACI, which is located in Arlington, Virginia. McGillicuddy is also a director of these corporations. Edmonds is the other director of these corporations, except MAI. Kathy McGillicuddy, McGillicuddy's wife, is a director of MAI. Jon Olson (Olson), comptroller for ACI, is the secretary-treasurer of ACI, MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG, although he is not a director of or shareholder in any of these corporations. According to Hukill, during the period relevant to this appeal, ACI had five employees, MAI had eight, KPAC had ten, WCAC had six, and VAC, AAC, WSA, and BCG each had twelve. See Appellee's Brief at 4 n.2.

ACI, MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG each operates at separate locations in Northern Virginia; files separate tax returns; holds separate shareholder and Board of Directors' meetings; conducts separate banking operations; with minor exceptions, pur-

_____

[1] With respect to these corporations, Jimmy Edmonds (Edmonds) owns the other 50% of the stock.

3

chases goods separately; enters into separate lease agreements; and does not share office space.**2**

For each corporation, in his capacity as president and chief executive officer, McGillicuddy establishes wage and benefit guidelines. For each automobile service station and tire center, in his capacity as president and chief executive officer, McGillicuddy hires a manager who is responsible for managing the automobile service station or tire center's day-to-day operations.**3** Each manager is responsible for hiring employees and negotiating the salary of the new employee using the guidelines established by McGillicuddy. In general, McGillicuddy, as president and chief executive officer of each automobile service station and tire center, does not get involved in the operational and employment matters of each station unless requested by an individual manager. Olson, as secretary-treasurer of each automobile service station and tire center, does not get involved in employment matters, but does have to approve large expenditures. Finally, ACI has no role in MAI, KPAC, WCAC, VAC, AAC, WSA, or BCG's labor relations; no power to hire, fire, or supervise employees at its clients' companies; and no power to control the work schedules of the employees of its clients. Furthermore, there is no evidence that MAI has any control over the labor relations of KPAC, WCAC, VAC, AAC, WSA, or BCG, or vice versa.

However, there is some evidence in the record suggesting that ACI, MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG's operations are interrelated. For example, aside from the obvious commonality of officers and directors, ACI made some bulk purchases of equipment on behalf of MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG; on occasion, some employees were transferred from one automobile service station to another; the manager of BCG ran an advertisement in a newspaper implying an affiliation between BCG, ACI, MAI, AAC,

---

**2** ACI and AAC have offices in the same building, but they are maintained in different office suites on non-contiguous floors.
**3** For a short time, Doug Hinken, while employed by ACI, was the general manager of all of the automobile service stations. However, in this capacity, Hinken did not manage the day-to-day operations of each automobile service station and had no power to hire or fire individual employees.

4

and WSA; and ACI's letterhead contained the business listings of MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG.

B

Hukill began working at MAI's automobile service station as an automotive inspector in early 1994. On October 4, 1996, Hukill left work for six weeks in order to undergo surgery for a chronic health condition. After Hukill went on leave, MAI hired a replacement automotive inspector. On November 14, 1996, when Hukill attempted to return to work at MAI's automobile service station, he was informed by his manager, Hugh Walser, "There's no work for you." (J.A. 118). Approximately two weeks later, McGillicuddy offered Hukill a position as an automotive inspector at the automobile service station owned and operated by WCAC, but Hukill declined to accept the offered position.

Hukill then pursued his administrative remedies with the United States Department of Labor (DOL). During discussions with the DOL, in April 1997, McGillicuddy offered Hukill his former position at MAI's automobile service station. After concluding that ACI, MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG constituted an "integrated employer," 29 C.F.R. § 825.104 (c)(2), for purposes of the FMLA, the DOL calculated Hukill's damages to be $3,256. This amount represented the difference in the salary Hukill would have earned at MAI's automobile service station and the salary Hukill would have earned at WCAC's automobile service station for the period covering the time Hukill was offered the position at WCAC's automobile service station until the time Hukill was offered reinstatement to his former position at MAI's automobile service station.[4]

On October 2, 1997, Hukill commenced this action by filing a complaint in the United States District Court for the Eastern District of Virginia. The complaint named ACI, MAI, and McGillicuddy as

_____

[4] In April 1997, MAI paid Hukill an amount that represented Hukill's salary for the period (two weeks in November 1996) covering the time Hukill was not reinstated in his position at MAI's automobile service station and the time he was offered the position at WCAC's automobile service station.

5

defendants. The complaint alleged that the defendants violated the FMLA when they refused to reinstate Hukill in his former position with MAI upon his return from a leave of absence for a surgical procedure. Hukill sought unpaid back wages, commissions, employment benefits, front pay, prejudgment and postjudgment interest, liquidated damages, attorney's fees, and costs.

Prior to trial, the district court held that, even though the defendants, individually or collectively, employed less than fifty employees during the period relevant to Hukill's FMLA claims, it had subject matter jurisdiction over Hukill's FMLA claims because the defendants and KPAC, WCAC, VAC, AAC, WSA, and BCG constituted an "integrated employer," 29 C.F.R. § 825.104(c)(2), and, therefore, the defendants were employers under the FMLA.

Following a jury trial, the jury found in Hukill's favor. Judgment was entered in favor of Hukill in the amount of $17,825 on his FMLA claims, and the district court also awarded costs and attorney's fees in the amount of $56,545.97. The defendants noted a timely appeal.

II

The defendants' principal contention on appeal is that the district court lacked subject matter jurisdiction over Hukill's FMLA claims. According to the defendants, because ACI and MAI, individually or collectively, employed less than fifty employees during the period relevant to Hukill's FMLA claims, the district court lacked subject matter jurisdiction over those claims. The district court held that it had subject matter jurisdiction over Hukill's FMLA claims because, even though ACI and MAI, individually or collectively, employed less than fifty employees during the relevant period, the defendants were "employers" for purposes of the FMLA because the defendants were part of a larger "integrated employer," id., that included KPAC, WCAC, VAC, AAC, WSA, and BCG.[5] We review a district court's subject

_____

[5] The district court did not squarely address whether McGillicuddy was subject to individual liability under the FMLA. We note that this court has not addressed this issue and need not address it today because Hukill's claim of individual liability against McGillicuddy necessarily fails if he (Hukill) cannot establish that MAI or ACI is his employer as that term is defined in the FMLA. See 29 U.S.C. § 2611(4)(A)(i) and (ii).

6

matter jurisdiction determination <u>de novo</u>. <u>See Evans v. B.F. Perkins Co.</u>, 166 F.3d 642, 647 (4th Cir. 1999).

The purpose of the FMLA is to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons. <u>See</u> 29 U.S.C. § 2601(b). In addition to providing eligible employees with up to twelve weeks of unpaid leave to handle qualifying medical and family problems, <u>see</u> 29 U.S.C. § 2612(a)(1), the FMLA ensures that those who take such leave will be restored to their former position or an equivalent position upon returning to work, <u>see</u> 29 U.S.C. § 2614(a)(1). Employers who violate the FMLA are liable to the injured employee for compensatory damages, back pay, and equitable relief. <u>See</u> 29 U.S.C. § 2617(a)(1).

The FMLA defines an "employer" as, <u>inter alia</u>,

> (i) . . . any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;
>
> (ii) includ[ing]-
>
> any person who acts, directly or indirectly, in the interest of the employer to any of the employees of such employer . . . .

29 U.S.C. § 2611(4)(A)(i) and (ii). Under the FMLA, the "term `person' has the same meaning given such term in [the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219]." 29 U.S.C. § 2611(8). The FLSA defines "person" as any "individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. § 203(a).

A district court lacks subject matter jurisdiction over an FMLA claim if the defendant is not an employer as that term is defined in the FMLA. <u>Cf. Woodward v. Virginia Bd. of Bar Examiners</u>, 598 F.2d

7

1345, 1346 (4th Cir. 1979) (affirming dismissal of Title VII claim for lack of subject matter jurisdiction because defendant was neither an "employer," an "employment agency," nor a "labor organization" as those terms are defined in Title VII); see also Scarfo v. Ginsberg, 175 F.3d 957, 961 (11th Cir. 1999) (holding that whether defendants constituted "an `employer'" within Title VII is a question of subject matter jurisdiction); Armbruster v. Quinn, 711 F.2d 1332, 1335 (6th Cir. 1983) (same); but see Sharpe v. Jefferson Distrib. Co., 148 F.3d 676, 677-78 (7th Cir. 1998) (holding that question of whether employer has more than fifteen employees so as to be subject to Title VII is not jurisdictional, but merits related), abrogated on other grounds by Papa v. Katy Indus., Inc., 166 F.3d 937, 939-40 (7th Cir. 1999); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 623-24 (D.C. Cir. 1997) (holding that question of whether defendant was a covered entity under ADA is not jurisdictional, but merits related).

Although a direct employment relationship provides the usual basis for liability under the civil rights statutes, the ambiguity of the term employer in the civil rights statutes has driven courts to fashion a variety of tests by which a defendant that does not directly employ the plaintiff may still be considered an employer under those statutes. See Papa, 166 F.3d at 939-43; Frank v. U.S. West, Inc., 3 F.3d 1357, 1362 & n.2 (10th Cir. 1993); Johnson v. Flowers Indus., Inc., 814 F.2d 978, 980-82 (4th Cir. 1987). Hukill advocates the use of one of these tests, the "integrated employer" test.

Under the "integrated employer" test, several companies may be considered so interrelated that they constitute a single employer. See Armbruster, 711 F.2d at 1337-38 (Title VII); York v. Tennessee Crushed Stone Ass'n, 684 F.2d 360, 362 (6th Cir. 1982) (ADEA). The "integrated employer" test initially was developed in the labor relations context, see Radio & Television Broad. Technicians Local 1264 v. Broadcast Serv. of Mobile, Inc., 380 U.S. 255 (1965) (per curiam), and subsequently was imported into the civil rights context, see Armbruster, 711 F.2d at 1336-37 (Title VII). Pursuant to its authority to promulgate regulations "necessary to carry out" the FMLA, see 29 U.S.C. § 2654, the DOL has adopted the "integrated employer" test. See 29 C.F.R. § 825.104(c)(2).

In determining whether to treat corporate entities as an "integrated employer," according to the DOL regulations, the factors we should consider include: (1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control. See id. **6** However, no single factor is conclusive. Id. Nevertheless, control of labor operations is the most critical factor. See Schweitzer v. Advanced Telemarketing Corp., 104 F.3d 761, 764 (5th Cir. 1997) (recognizing that control of labor relations prong has traditionally been the most important).**7**

This court need not address whether 29 C.F.R. § 825.104(c)(2) is entitled to full Chevron deference, see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984) (noting that an agency's interpretation of a statute with which it has been charged with administering and which has been reduced to a regulation is to be fully accepted by a court as long as Congress has not directly spoken as to the precise question at issue and the interpreta-

_____

**6** These factors are identical to those applied in cases involving other civil rights statutes. See, e.g., Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 993-94 (6th Cir. 1997) (ADEA and ADA).

**7** In Johnson, an ADEA case, we recognized that other courts have applied the "integrated employer" test, but declined to adopt it. See 814 F.2d at n.*. We stated that "[w]e need not adopt such a mechanical test in every instance; the factors all point to the ultimate inquiry of parent domination. The four factors simply express relevant evidentiary inquiries whose importance will vary with the individual case." Id. Interestingly, the "integrated employer" test was rejected recently by the Seventh Circuit in Papa, a case involving the ADEA and the ADA. In that case, the court criticized

> the vagueness of three of the four factors (all but "common ownership" and it, as we shall see, is useless); because, being unweighted, the four factors do not yield a decision when, as in the two cases before us, they point in opposite directions; and because the test was not custom-designed for answering exemption questions under the antidiscrimination laws, but instead was copied verbatim from the test used by the National Labor Relations Board to resolve issues of affiliate liability under the laws administered by the Board.

166 F.3d at 940.

9

tion proffered by the agency is a permissible one), because even applying the "integrated employer" test in this case does not yield the conclusion that MAI was part of a larger integrated employer that included ACI, let alone KPAC, WCAC, VAC, AAC, WSA, and BCG.

With respect to common management, each automobile service station and tire center has its own manager, who controls the day-to-day operations of the service station or tire center and has the authority to hire and fire employees. For a short time, Doug Hinken, while employed by ACI, was the general manager of all of the automobile service stations. However, in this capacity, Hinken did not manage the day-to-day operations of each automobile service station and had no power to hire or fire individual employees. In general, McGillicuddy, as president of each automobile service station and tire center, does not get involved in operational and employment matters unless requested by an individual manager. Also, Olson, the secretary-treasurer of each corporation, does not get involved in employment matters, but does have to approve large expenditures. In light of this evidence, this prong favors neither party. Cf. McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 933-34 (11th Cir. 1987) (common management found where common president controlled personnel management of both corporations); Baker v. Stuart Broadcast. Co., 560 F.2d 389, 392 (8th Cir. 1977) (common management found where the same individual was president of both corporations and where that individual had day-to-day control of both operations and had issued strict policy manuals regimenting daily operations for the managers).

With respect to the interrelation of operations, the operations of ACI, MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG were interrelated to some degree. For example, MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG purchase administrative services from ACI, and ACI selects the towing companies for MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG. There is also evidence in the record demonstrating that ACI made some bulk purchases of equipment on behalf of MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG; on occasion, some employees were transferred from one automobile service station to another; the manager of BCG ran an advertisement in a newspaper implying an affiliation between BCG, ACI, MAI, AAC,

10

and WSA; and ACI's letterhead contained the business listings of MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG. Although this evidence does demonstrate some interrelationship of operations, on balance, this evidence is pale in comparison to the evidence indicating that each company operates separately and distinctly. Each company operates at separate locations, files separate tax returns, holds separate shareholder and Board of Directors' meetings, conducts separate banking operations, is not undercapitalized, in general, purchases goods separately, enters into separate lease agreements, is not managed day-to-day by the same person, and does not share office space.

Hukill makes much of the fact that MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG purchase administrative services from ACI. However, this practice is not unusual in today's business climate and is of no consequence. As the court in Papa noted:

> Firms too tiny to achieve the realizable economies of scale or scope in their industry will go under unless they can integrate some of their operations with those of other companies, whether by contract or by ownership. The choice between the two modes of integration is unrelated to the exception. Take contractual integration first. A firm too small to have its own pension plan will join in a multi-employer pension plan or will in effect pool with other employers by buying an insurance policy. . . . It will consult an outside law firm, representing many business firms, rather than having a staff of in-house lawyers. It will hire an accounting firm to do its payroll rather than having its own payroll department. It may ask the Small Business Administration for advice on how to maximize its profits by pruning its least profitable operations. None of these forms of contractual integration would subject tiny employers to the anti-discrimination laws, because the integration is not of affiliated firms. Why should it make a difference if the integration takes the form of common ownership, so that the tiny employer gets his pension plan, his legal and financial advice, and his payroll function from his parent corporation without contractual formalities, rather than from independent contractors?

11

166 F.3d at 942.

With respect to labor operations, there is little evidence, if any, that the control of labor operations was centralized. ACI had no role in MAI, KPAC, WCAC, VAC, AAC, WSA, or BCG's labor relations; no power to hire, fire, or supervise employees at its clients' companies; and no power to control the work schedules of the employees of its clients. Furthermore, there is no evidence that MAI had any control over the labor relations of KPAC, WCAC, VAC, AAC, WSA, or BCG, or vice versa. In light of this evidence, we conclude this prong weighs heavily against Hukill. Cf. Frank , 3 F.3d at 1363 ("To satisfy the control prong, a parent must control day-to-day employment decisions of subsidiary.").

With respect to common ownership, although Hukill has made a showing of common, though not identical, ownership (100% of MAI's stock is owned by McGillicuddy, 50% of ACI, KPAC, WCAC, VAC, AAC, WSA, and BCG's stock is owned by McGillicuddy), such a showing is not enough, even when coupled with the other factors, to establish that ACI, MAI, KPAC, WCAC, VAC, AAC, WSA, and BCG are an "integrated employer." Cf. Johnson, 814 F.2d at 982 ("One-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying an alter ego theory to pierce the corporate veil." (citation and internal quotation marks omitted)).

It has been said that the "integrated employer" test instructs a court to determine "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination." Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir. 1983) (citation and internal quotation marks omitted). In this case, the record suggests that no entity other than MAI made the final decision regarding Hukill's employment status. Accordingly, because MAI employs less than fifty employees, the district court erred when it concluded that it had subject matter jurisdiction over Hukill's FMLA claim against MAI. Because ACI was not Hukill's employer, the district court erred when it concluded that it had subject matter jurisdiction over Hukill's FMLA claim against ACI. Because MAI and ACI were not subject to liability, the district court necessarily lacked jurisdiction over

12

Hukill's FMLA claim against McGillicuddy in his individual capacity. <u>See</u> 29 U.S.C. § 2611(4)(A)(i) and (ii).

III

For the reasons stated herein, we vacate the district court's judgment and remand with instructions to enter an order dismissing the case for lack of subject matter jurisdiction.

<u>VACATED AND REMANDED WITH INSTRUCTIONS</u>

13