**Richard A. THOMPSON, Plaintiff,**

v.

**UGL UNICCO SERVICE COMPANY d/b/a UGL Unicco, Defendant.**

No. 09–1106.

United States District Court,
W.D. Tennessee,
Eastern Division.

Oct. 29, 2010.

William Lewis Jenkins, Jr., Wilkerson Gauldin Hayes & Jenkins, Dyersburg, TN, for Plaintiff.

James R. Mulroy, II, Pamela R. Irons, Jackson Lewis LLP, Memphis, TN, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

J. DANIEL BREEN, District Judge.

### INTRODUCTION

The Plaintiff, Richard A. Thompson, initially brought this action against the Defendant, UGL Unicco Service Company d/b/a UGL Unicco ("UGL Unicco") on April 30, 2009. In his amended complaint filed May 29, 2009, Thompson alleged violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA") and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"). The Plaintiff also asserted state law claims of retaliatory discharge and violation of the Tennessee Disability Act, Tennessee Code Annotated § 8–50–103 ("TDA"),[1] and the Tennessee Human Rights Act, Tennessee Code Annotated § 4–21–101, *et seq.* ("THRA"). Before the Court is the Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### STANDARD OF REVIEW

Rule 56 provides in pertinent part that a "... judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.,* 862 F.2d 597, 601 (6th Cir.1988). "The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *American Civil Liberties Union of Ky. v. Grayson County, Ky.,* 591 F.3d 837, 843 (6th Cir.2010), *reh'g denied,* 605 F.3d 426 (6th Cir.2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). However, to successfully oppose a summary judgment motion, "there must be evidence on which the jury could reasonably find for the plaintiff." *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 800 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.,*

---

1. Although the Plaintiff brings his claim under the Tennessee Handicap Act, the statute was amended effective April 7, 2008 and is now known as the Tennessee Disability Act. *See* Tenn.Code Ann. § 8–50–103(a); *Whited v. Cmty. Bank of the Cumberlands, Inc.,* No. 2–08–0061, 2010 WL 605280, at *8 n. 3 (M.D.Tenn. Feb. 18, 2010).

477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)); *see also Paul E. Volpp Tractor Parts, Inc. v. Caterpillar, Inc.*, 917 F.Supp. 1208, 1223 (W.D.Tenn. 1995). "When the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. at 1356 (citation & internal footnote omitted). "In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* at 587, 106 S.Ct. at 1356 (citation omitted) (emphasis in original). "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have the effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle of law to the rights and obligations of the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007), *reh'g en banc denied* (Jan. 10, 2008) (citation omitted). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *In re Morris*, 260 F.3d 654, 665 (6th Cir.2001) (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548).

## FACTS

The following material facts are undisputed for purposes of the instant motion unless otherwise indicated. UGL Unicco provides maintenance to clients in various markets throughout the nation. The Defendant renders services to a client identified as Poly One, a resin manufacturer, at facilities in Dyersburg and Halls, Tennessee. (Decl. of Glisette Soltero ("Soltero Decl.") §§ 1–2, 4.) Thompson began working at the Dyersburg location in July 2006. (1st Am. Compl. ¶ 8.) He had suffered from Type I diabetes since 1979, when he was in his early twenties, and was insulin-dependent. (*Id.* ¶ 9.) The Plaintiff advised the Defendant of his diabetes at the time of his hiring and was told the employer would work with him. (Dep. of Richard A. Thompson ("Thompson Dep.") at 116.)

Initially, he worked at UGL Unicco in inventory logistics on the second shift. (*Id.* at 116–17.) In November 2006, Thompson applied for and was awarded a computer-related position on the first shift at the Halls facility. (*Id.* at 116–18.) In February 2007, the Plaintiff contacted Beth Feger, who had interviewed him at the Dyersburg location, and requested a transfer back to Dyersburg, which was granted. (*Id.* at 123.) Upon his return, he worked as a material handler and in inventory logistics on the third shift, where he worked for over a year. (*Id.* at 123–24, 126–27.)

In March 2008, Thompson developed a blister on his right foot associated with wearing steel-toed boots at work. (*Id.* at 155–56.) He was treated by podiatrist William M. Steely, D.P.M. and was taken off work. (*Id.*) The parties do not dispute that the Plaintiff received workers' compensation benefits during this period. (Pl.'s Resp. to Statement of Undisputed Material Facts ¶ 29.) The Dyersburg site manager, Charles Nicholas Morris, arranged for him to come to the plant and perform computer work while the foot healed. (Thompson Dep. at 156–57.)

On May 23, 2008, the Plaintiff complained to Morris of a painful toe on his left foot from the shoes. (*Id.* at 164–66.) Morris advised him to see the doctor and Thompson was again treated by Dr. Steely and taken off work. (*Id.* at 166–67; Dep. of Charles Nicholas Morris ("Morris

Dep.") at 35; Dep. of William M. Steely, D.P.M. ("Dr. Steely Dep.") at 29, 35.)

According to Thompson's deposition, he returned to the plant to inform Morris of Dr. Steely's plan. (Thompson Dep. at 167.) The Plaintiff recalled, "On that day [(May 23, 2008)] I told Nick that Dr. Steely is going to take me off work because of the blister. I said, do you want to do workmen's comp? I said, whatever you want to do. I said, I know it's slow. I said, you know, if layoff until my foot heals … I said, do you want to file workmen's comp or I know business is slow, I do what would benefit the company." (*Id.* at 167–68.) Thompson knew he did not have to take a layoff. (*Id.* at 168.) A reduction in force would not have resulted in him being laid off due to his seniority status. (Morris Dep. at 35.) The Plaintiff testified in his deposition that Morris told him he would get back to him and later called to ask if he would take the layoff. (Thompson Dep. at 175.) In his declaration, Thompson averred that when he had been temporarily laid off on previous occasions, he had returned to the same job on the same shift at the same pay. (Thompson Decl. ¶ 14.) He assumed he would again return to the same job, although Morris did not say so. (*Id.* ¶ 17.) According to Morris, when the Plaintiff agreed to take a layoff, there was no guarantee of a job opening when he was ready to come back to work. (Morris Dep. at 34.)

Thereafter, the Plaintiff checked in with the site manager periodically to see how business was going. (Thompson Dep. at 172.) When he was released to return to work by Dr. Steely, he met with Morris on June 13, 2008. (*Id.* at 176.) Morris advised him there was an opening on the third shift beginning Monday, June 16.(*Id.*) Thompson expressed his desire to work the first shift instead of the third, but said he would work the third shift if he had to and accepted the offer. (*Id.* at 176, 248.)

After pondering the matter over the weekend, the Plaintiff asked Morris why he was put on the third shift instead of one of two other individuals over whom he had seniority. (*Id.* at 176.) Morris told him he would call him back. (*Id.* at 176–77.) The Plaintiff obtained paperwork from Ralph Goodman, M.D., his endocrinologist, dated June 27, 2008, in which the doctor opined that Thompson's diabetes was much better controlled when he worked the first shift and requested he be permanently assigned to that shift. (*Id.* at 178; Dep. of Ralph Goodman, M.D. ("Dr. Goodman Dep."), Ex. 1.) The paperwork was forwarded to the Defendant. (Thompson Dep. at 178.) Thompson acknowledges, however, that he could work the third shift. (*Id.*) The Plaintiff never received a callback from Morris and found out later he had been terminated. (*Id.* at 177.) The Plaintiff ultimately applied for and, in February 2009, received workers' compensation benefits in connection with the right toe. (*Id.* at 172.)

### POSITIONS OF THE PARTIES AND ANALYSIS

*FMLA Claim.*

■ The FMLA creates a private right of action entitling eligible employees to seek relief from an employer for interfering, restraining or denying the exercise of rights under the statute. *Mitchell v. Chapman,* 343 F.3d 811, 826 (6th Cir. 2003), *cert. denied,* 542 U.S. 937, 124 S.Ct. 2908, 159 L.Ed.2d 813 (2004). "Employer" is defined under the statute as "any person engaged in commerce or in any industry or activity affecting commerce who employs [fifty] or more employees for each working day during each of [twenty] or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i). One is not an "eligible employee" for purposes of the FMLA if he is "an employee

of an employer who is employed at a worksite at which such employer employs less than [fifty] employees if the total number of employees employed by that employer within [seventy-five] miles of that worksite is less than [fifty]." 29 U.S.C. § 2611(2)(B)(ii). If the parties do not fall under these definitions, the court has no jurisdiction. *See Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir.1999), *cert. denied*, 529 U.S. 1116, 120 S.Ct. 1978, 146 L.Ed.2d 806 (2000) ("A district court lacks subject matter jurisdiction over an FMLA claim if the defendant is not an employer as that term is defined in the FMLA."); *Humenny v. Genex Corp.*, 390 F.3d 901, 904 (6th Cir.2004), *reh'g en banc denied* (Mar. 29, 2005) ("Where a plaintiff does not qualify as an 'eligible employee,' the court lacks jurisdiction to decide the FMLA case."); *Heasley v. Carter's For Kids*, No. 3:05–0734, 2006 WL 1875963, at *1 (M.D.Tenn. July 5, 2006) ("Where a defendant in an FMLA suit does not meet the statutory definition of 'employer,' there is no federal subject matter jurisdiction over the claim against that defendant.").

At the time the instant motion and Plaintiff's response thereto were filed,[2] there was some question about the number of employees working for UGL Unicco for purposes of calculating whether it met the FMLA's "employer" definition. However, on August 4, 2010, the parties entered into a joint stipulation to the fact that UGL Unicco employed fewer than fifty people within a seventy-five mile radius of Dyersburg, the worksite from which the Plaintiff was separated, during every month of his employment. (*See* Docket Entry 45.) Thus, as it now appears to be undisputed that the Defendant was not at the relevant

time an "employer" under the FMLA, Thompson's claim under that statute is DISMISSED.[3]

*Claims under the ADA, TDA and THRA.*

■ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the statute, a plaintiff must show "(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability." *Spees v. James Marine, Inc.*, 617 F.3d 380, 395 (6th Cir.2010) (quoting *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir.2008)).

■ Discrimination claims under state law arising from an adverse employment action are properly brought pursuant to the TDA, rather than the THRA. *Allen v. STHS Heart, LLC*, No. 3:09–0455, 2010 WL 2133901, at *12 n. 19 (M.D.Tenn. May 21, 2010), *recons. denied in part by* 2010 WL 2572127 (M.D.Tenn. June 21, 2010). "The TDA works in conjunction with the THRA to grant an individual a civil cause of action for wrongful discrimination based upon a disability. Thus, disability claims alleged under the THRA have been treated as being alleged under the TDA." *Whited*, 2010 WL 605280, at *8 (citations omitted). Accordingly, any separate claim for

---

**2.** The motion and response were placed on the docket on June 25 and July 30, 2010, respectively.

**3.** To the extent the Plaintiff continues to maintain that the FMLA applies because he

was granted "FMLA leave" by his employer, he has cited to no case, and the Court doubts there is any, holding that the statement of an employer can override the provisions and limitations of the statute.

disability discrimination under the THRA is DISMISSED. *See id.* ("there is no separate claim of disability discrimination under the THRA"). Analysis of claims under the TDA is guided by federal ADA law. *Allen,* 2010 WL 2133901, at *12 n. 19.

The Defendant argues that Thompson has failed to demonstrate the first and third prongs of the prima facie case. With respect to the first, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." [4] 42 U.S.C. § 12102(2) (2006). Although this provision was amended in 2009, subsequent to the events from which this lawsuit arose, the Court must analyze Thompson's claims under the earlier version quoted above, as the amendments do not apply retroactively. *See Milholland v. Sumner County Bd. of Educ.,* 569 F.3d 562, 566–67 (6th Cir.2009) (2009 amendments do not apply to conduct occurring prior to the amendments). A plaintiff has the burden of showing that he is disabled. *Johnson v. Cleveland City Sch. Dist.,* 344 Fed.Appx. 104, 111 (6th Cir.2009) (citing *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 869 (6th Cir.2007)).

█ Under the regulations implementing the ADA, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h)(1). It is undisputed that Thompson is an insulin-dependent diabetic, which has been held to

be a physical impairment under § 1630.2(h)(1). *See McPherson v. Federal Exp. Corp.,* 241 Fed.Appx. 277, 281 (6th Cir.2007) (insulin-dependent diabetic suffered from physical impairment under the ADA). However, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002). It must now be determined whether his diabetes "substantially limit[s] one or more of [Thompson's] major life activities." *See McPherson,* 241 Fed.Appx. at 281; *see also Salim v. MGM Grand Detroit, L.L.C.,* 106 Fed.Appx. 454, 459 (6th Cir.2004) (while plaintiff was an insulin-dependent diabetic, to avoid summary judgment, she still had to demonstrate more than a physical impairment).

█ "Whether a person has a disability under the ADA is an individualized inquiry." *McPherson,* 241 Fed.Appx. at 281 (quoting *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). "The standard for qualifying as 'disabled' is 'demanding' and courts must interpret strictly the terms 'major life activities' and 'substantially limits' in making the disability determination." *Id.* (citing *Toyota Motor Mfg.,* 534 U.S. at 197, 122 S.Ct. 681). The Plaintiff is required to identify a "major life activity" and demonstrate that his diabetes "substantially limits" his performance of that "major life activity." *See id.* "Major life activities" are those "that are of central importance to daily life" and are defined as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 450 (6th Cir.2007) (quoting 29 C.F.R. § 1630.2(i)).

---

**4.** Although the Plaintiff included in his amended complaint an alternative claim under the "regarded as" provision, he makes no mention thereof in his response to the motion for summary judgment. The Court therefore assumes he has abandoned it.

■ "Substantially limits" refers to an individual who is "[u]nable to perform a major life activity that the average person in the general population can perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). "A substantial limitation of such an activity exists when the individual's ability to perform that activity is *limited to a large degree.*" *Brady v. Potter*, 273 Fed.Appx. 498, 502 (6th Cir. 2008) (citing *Toyota Motor Mfg.*, 534 U.S. at 196–97, 122 S.Ct. 681) (emphasis added). "It is not enough for the impairment to cause merely moderate or intermittent interruptions in the performance of the activity." *Id.* at 502–03 (citing *Mahon v. Crowell*, 295 F.3d 585, 590–91 (6th Cir. 2002)). In determining whether a plaintiff's limitations are "substantial," the court is to consider "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *E.E.O.C. v. DaimlerChrysler Corp.*, 111 Fed.Appx. 394, 399 (6th Cir.2004) (citing 29 C.F.R. § 1630.2(j)(2)) (internal quotation marks omitted). However, the long term existence of an impairment in itself is not sufficient to establish a disability. *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1157 (11th Cir.2005). The inquiry is to focus on the impairment's effects on the individual's daily life, not only on his ability to perform his particular job. *Toyota Motor Mfg.*, 534 U.S. at 200–01, 122 S.Ct. at 693. The question of whether a plaintiff is substantially impaired for disability purposes is to be considered in light of available mitigation measures such as taking insulin. *See Sutton*, 527 U.S. at 482–83, 119 S.Ct. at 2146–47; *Collado*, 419 F.3d at 1157.

■ Regretfully, Thompson has failed to specifically identify the "major life activities" he claims are substantially limited. However, giving his brief the most generous interpretation possible, it would appear to the Court that he suggests substantial limitation in the major life activities of self-care, walking, thinking and seeing.[5]

---

5. In his amended complaint, the Plaintiff alleged his diabetes affected his ability to work, sleep and eat. (1st Am. Compl. ¶ 10.) The Defendant contended in its motion that he had not established he was substantially limited in the activity of working. In his response, however, Thompson not only failed to address UGL Unicco's argument, but made no mention whatever of the major life activity of working. Even if the Court were not to take his silence on this issue as evidence that he has chosen not to base his claim on the major life activity of working, the Plaintiff has failed to make an adequate showing. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Watts v. United Parcel Serv.*, 378 Fed.Appx. 520, 525 (6th Cir.2010) (quoting *Sutton*, 527 U.S. at 491, 119 S.Ct. 2139). To determine if the plaintiff "is precluded from a substantial class or broad range of jobs, [courts] compare his access to jobs to the access available to a non-injured individual with similar training and experience, looking specifically to the labor market in the claimant's geographic vicinity." *Mahon*, 295 F.3d at 591 (citing *Sutton*, 527 U.S. at 491–92, 119 S.Ct. 2139 & *Burns v. Coca–Cola Enter., Inc.*, 222 F.3d 247, 253–54 (6th Cir. 2000)). Thompson has made no attempt to allege or demonstrate he was unable to work in a broad class of jobs.

As for sleeping, Plaintiff testified in his deposition that his diabetes affects his ability to sleep by keeping him awake "[i]f it's up or down." (Thompson Dep. at 225.) This rather vague statement, without more, in not enough to establish a substantial limitation in

The Plaintiff has based his disability claim on the wide fluctuations of his blood sugar levels on a daily basis. Nonetheless, he testified in his deposition that he could perform whatever job was asked of him so long as he monitored his blood sugar. (Thompson Dep. at 213–14, 221.) On August 15, 2007, Dr. Goodman signed a UGL Unicco form reflecting that the Plaintiff could perform the functions of his job, which included working an eight-hour shift from 10:30 p.m. to 7:00 a.m., operating a forklift and riding sweeper, lifting fifty pounds periodically, and operating a computer in an office and on a forklift. (*Id.*, Ex. 4.) The form also indicated glucose limits of sixty at the low end and 400 at the high end. (*Id.*)

In another form completed by Dr. Goodman regarding Thompson's medical restrictions and capabilities, the physician answered the question "To what extent does the condition(s) impact major life activities, such as walking, talking, seeing, hearing, working, learning, caring for oneself, interacting with others, etc.?" with "not applicable." (*Id.*, Ex. 1.) He responded in the negative to the query "Does the employee's medical condition prevent him from being at work?" (*Id.*)

The following testimony was taken in Plaintiff's deposition relative to his daily functioning:

Q: Okay. It says: The diabetes affects my daily functioning in almost every way every day. Now, what do you mean by that?

A: You constantly have to monitor, you know, once again fluctuates, up and down, up and down. You have to check it. You have to watch what you eat, especially when you're a Type 1. It is a little more difficult than a Type 2.

Q: Okay. But it didn't keep you from walking or running or playing golf or playing—or shooting basketball anyway?

A: Just like, you know, I said, I would have to, you know, check it where it fluctuates being many times where my sugar dropped and I would start jerking and shaking, you know, with the golf, the basketball. I just have to take one of those glucose tablets.

(*Id.* at 225–26.) He reported that he ran at least three miles per day unless he was recovering from some type of surgery. (*Id.* at 226.) According to his declaration, Thompson also periodically took time off to help his father with his cotton crop. (Decl. of Richard Thompson ("Thompson Decl.") ¶ 13.)

The Plaintiff avers that he checks his blood sugar sometimes up to ten times per day using a small meter into which he inserts a disposable strip containing a drop of blood from his fingertip. (Thompson Decl. ¶¶ 3, 6.) The process takes only a few seconds. (Thompson Dep. at 128.) In his

the major life activity of sleeping. *See Burrell v. Cummins Great Plains, Inc.,* 324 F.Supp.2d 1000, 1013–14 (S.D.Iowa 2004) (plaintiff's indirect suggestion that his sleeping is affected by diabetes, with no indication of the degree to which it is substantially limited, is insufficient to survive summary judgment motion). With respect to eating, Thompson submits only that he must watch what he eats. However, monitoring food intake does not constitute a substantial limitation. *See Collado,* 419 F.3d at 1156 ("If it [did], all insulin-dependent diabetics would have a 'disability' for ADA purposes, and we know from *Sutton* that they do not."); *Fraser v. Goodale,* 342 F.3d 1032, 1041 (9th Cir.2003), *cert. denied,* 541 U.S. 937, 124 S.Ct. 1663, 158 L.Ed.2d 358 (2004) ("Not every impediment to the copious and tasty diets our waistlines and hearts cannot endure is a substantial limitation of the major life activity of eating. We must carefully separate those who have simple dietary restrictions from those who are truly disabled.").

deposition, Thompson stated that he monitored his blood sugar between three and five times per work shift. (*Id.* at 221.) The more frequently he checks his sugar levels, the less likely sharp fluctuations in those levels are to occur. (Thompson Decl. ¶ 3.) His blood sugar levels made wide swings "during most days." (*Id.* ¶ 8.) Although he could regulate blood sugar by injecting or requesting (if using a pump) more insulin, it "did not keep the fluctuations from happening." (*Id.*) He asserts that extremely low blood sugar results in anxiousness, nervousness, trembling, confusion, disorientation, inability to walk or think properly, uncontrollable shaking and jerking, and blurred vision. (*Id.* ¶ 9.) High blood sugar leads to muscle pain, intense headaches and burning sensations. (*Id.* ¶ 12.) Low blood sugar episodes require that he drink juice or chew a glucose tablet while incidents of high glucose are treated with injection of additional insulin. (*Id.*) The episodes are not, he maintains, predictable. (*Id.* ¶ 10.) When they occur, he must stop what he is doing, sit down and consume juice, fruit or glucose tablets. (*Id.* ¶ 11.) On some occasions, he would go into the restroom in order to recover from the episodes. (*Id.*) Thompson submits that the extreme incidents he described "occurred at work during the time during [his] work at [UGL] Unicco," but did not state how often they took place. (*Id.*) He missed no more work due to his diabetes than other employees who were not diabetic. (Thompson Dep. at 223–25.)

Dr. Goodman described the Plaintiff's condition thusly:

A: I would say it was moderately severe; in other words, I've seen people that were more incapacitated by their complications. But he was certainly suffering from several different problems.

Q: Does Mr. Thompson have any challenges in controlling his blood glucose levels or the level of sugar in his blood?

A: Absolutely. That was always a problem from day one.

Q: All right. And in terms of the challenge faced by that, where do you place that on the spectrum of cases that you've seen?

A: He was pretty severe in what we call brittleness which means if he did the same thing every day—if he ate the same thing, took the same insulin, exercised the same—one day his blood sugar could be, say, at lunchtime 12– and the next day it might be 500. It was just all over the place.

Q: And that kind of problem has that existed for the entire time that you've treated him?

A: Yes. In fact, we even put him in the hospital at one point to try to stabilize him. We put him in a stable environment to see what we could do to get things regulated and it didn't really, I don't think, add anything to his control.

Q: When the blood sugar gets really low what sort of symptoms might he have?

A: Typically, when you have low blood sugar you can have two types of symptoms. You can have the so called adrenergic symptoms where you get shaky, sweaty, nervous. But sometimes some people have very, you know, very little symptoms even with the 300 or 400 blood sugars.

Q: What about at the level of 500?

A: At that level you're spilling enough glucose in your urine where you're certainly going to feel thirsty, you're going to be frequently uri-

nating, and you can get dehydrated if you don't replace the fluid.

\* \* \*

Q: In terms of, say, the foods that he can eat what effect does his diabetes have on his eating?

A: Well, he can pretty much eat what he wants within reason. I mean he can't go out and eat a big, whole birthday cake but I mean he can eat ordinary foods if he adjusts his insulin dose to compensate for the amount of carbohydrates in those meals that he's eating.

(Dr. Goodman Dep. at 10–13.)

In Dr. Goodman's opinion, however, the Plaintiff did not suffer from an impairment in terms of the job duties he could perform. (*Id.* at 36.) He stated that "[o]nly if there was something that his vision did not permit him to do or that required him to have sensation in his feet. That might be a problem. But other than that I was never aware that he was doing anything that would be an issue in terms of his diabetes." (*Id.*) The physician offered no additional testimony concerning Thompson's vision. With respect to his feet, the following testimony was adduced in Dr. Goodman's deposition:

A: Okay. I would say based on the exam notes that I have that his neuropathy was mild to moderate. Based on number one, the absence of reflexes at his ankle. His Achilles tendon. Number two, the decrease in proprioception or position sensation that I noted on his first exam. But he did have intact filament sensation, which is a microfilament test, in 1996.

Q: That means in layman's terms that he could actually feel his feet?

A: Yes.

Q: And that he was not so impaired that he would have that numbness that people are familiar with when their feet fall asleep, correct?

A: Right. In other words, if he had a marble in his shoe he would feel it.

Q: He'd feel it? Okay.

A: Right.

(*Id.* at 38.) There was no cyanosis, infection or ischemia of the feet. (*Id.* at 40.) However, the physician did note redness on the Plaintiff's toes and hammer toe, caused by a shoe rubbing against the skin. (*Id.* at 40–41.)

While "it could have theoretically at least helped his condition to work the first shift[,]" Dr. Goodman opined that Thompson could have worked the night shift. (*Id.* at 50.) The physician, in reviewing logs of glucose readings prepared by the Plaintiff, observed that he did not "think you could do any kind of prediction about when his highest or lowest were." (*Id.* at 32.) Indeed, he denied conducting any analysis on how the Plaintiff felt or performed on either shift, stating that he probably relied on what Thompson told him. (*Id.* at 50–51.) When asked if the Plaintiff told him he wanted to work the first shift, Dr. Goodman replied, "Probably." (*Id.* at 51.) The deposition also contained the following testimony:

Q: . . . And you don't have an opinion as to what type of work he should be doing?

A: As far as I'm concerned, he can do anything for which he is otherwise qualified and trained. Anybody that can get out and run five or six miles in the morning, they can do pretty much anything physically.

Q: And the things we've talked about— the retinopathy, the kidney issues or the potential kidney issues, his foot condition, and I think that was about it—none of those things are keeping him from working, correct?

A: Right.

(*Id.*)

Thompson was examined by Dr. Steely concerning the possibility of performing surgery on the hammertoe and another toe that was deformed. (Dr. Steely Dep. at 10.) Had the Plaintiff elected a surgical intervention, his diabetes would not have been an impediment. (*Id.* at 11.) However, Thompson rejected the surgery option because it would keep him from running during the necessary recovery period. (*Id.* at 11–12.) Concerning his treatment of the Plaintiff's foot blisters, Dr. Steely gave testimony, to wit:

Q: In respect to his blisters, could you ascertain whether or not the diabetes had any impact as far as forming the blister—first forming the blister?

A: Diabetes usually doesn't cause a blister to form.

Q: Okay.

A: So from that standpoint I can tell you, no, diabetes would not cause a blister to form. Blisters form because of pressure, because of friction.

(*Id.* at 13.)

Q: ... I'm assuming that he could do any kind of work. It was just a question of wearing the shoes and potentially hurting his foot?

A: Sure. . . .

(*Id.* at 24–25.) According to the podiatrist, the Plaintiff also suffered from calluses on his feet, which he described as "run-of-the-mill" and "strictly weight bearing." (*Id.* at 24.)

The Court finds the Plaintiff clearly is not substantially limited in the major life activity of walking. In order to be covered under the ADA, an impairment must be severely restrictive—that is, "it limits the impaired individual in the context of what 'most people' do in their 'daily lives.'"

*Singh v. George Washington Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1100–01 (D.C.Cir.2007); *see also Lyons v. Louisiana Pac. Corp.*, 217 F.Supp.2d 171, 178 (D.Me.2002) ("Many individuals in Maine find it difficult to walk, let alone run, up and down Mount Katahdin. Lyons must produce evidence that his inability to walk long distances was worse than the general populations' inability to walk long distances."). Thompson has testified that he runs from three to five miles per day and helps his father on his cotton farm. Most people cannot run three miles every day or perform heavy farm labor. Moreover, the evidence before the Court reveals that, at most, Thompson's ability to walk is affected only during low blood sugar episodes. "Even severe symptoms which are episodic do not constitute a substantial limitation on a major life activity." *Burrell*, 324 F.Supp.2d at 1015 (citing *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 353 (4th Cir. 2001)) (plaintiff's difficulty walking during a low blood sugar episode did not constitute a substantial limitation). As Thompson has failed to produce evidence that any inability to walk or run from which he suffers is greater than that of the general population, or that it is anything more than episodic, he has not shown a genuine issue of material fact as to whether he was substantially limited in the major life activity of walking.

With respect to the remaining life activities at issue, Thompson relies heavily on Dr. Goodman's characterization of him as a "brittle" diabetic, which means that "blood sugar levels are very difficult to control" because "glucose levels tend to swing fairly quickly high or low." *See Fraser*, 342 F.3d at 1035. The Sixth Circuit Court of Appeals addressed the ADA with respect to a brittle diabetic in *Salim*. The plaintiff therein, a casino worker who often was required to work the night shift, alleged that

her diabetes substantially limited her ability to work, think and take care of herself. In support, Plaintiff points to the medical evidence showing that her blood sugars are not controlled and that these major life activities are impaired during unpredictable hypoglycemic episodes that pose the risk of death. She points to an unspecified number of episodes while working at MGM when she became dizzy, had difficulty breathing, and fell down. On about ten occasions at work, she had stomach cramps, heart palpitations and bouts of diarrhea and sweating between the hours of 1:30 and 2:00 a.m. She also began experiencing blurry vision while at work ...

*Salim,* 106 Fed.Appx. at 459. The court concluded that those symptoms did not create a triable issue as to whether Salim was substantially limited to perform a major life activity. *Id.* at 459–60.

In doing so, the court distinguished the case before it from the Seventh Circuit's opinion in *Nawrot v. CPC International,* 277 F.3d 896 (7th Cir.2002), *reh'g denied* (Mar. 12, 2002). In *Nawrot,* the diabetic plaintiff, a grocery store warehouse supervisor, claimed he was substantially limited in the major life activities of thinking and self-care. *Nawrot,* 277 F.3d at 899, 903.

[Nawrot] points out that as a consequence of his diabetes, he must inject himself with insulin approximately three times a day and must test his blood sugar level at least ten times a day. In addition, although he is able to manage his diabetes with constant monitoring and insulin injections (itself a substantial burden), this hardly remedies all the other adverse effects of his diabetes. Despite the most diligent care, Nawrot cannot completely control his blood sugar level. He suffers from unpredictable hypoglycemic episodes, of such extreme consequence that death is a very real and significant risk. On the occasions

he suffers from such an episode, his ability to think coherently is significantly impaired, as well as his ability to function. He has lost consciousness and fallen several times. In addition, his ability to express coherent thoughts is impaired, causing him to make nonsensical statements. He suffered three diabetic episodes at work in the two years before his termination. And aside from full-blown diabetic episodes, Nawrot has had "close calls," where he felt the onset of an episode but was able to avert a serious, debilitating attack.

Moreover, Nawrot's diabetes has progressively worsened. His difficulties became so overwhelming that in February 1997, he took medical leave to care for his physical health and attend to his diabetes management. By April 1997, his doctor described his diabetes as "brittle" and therefore "very likely that he will develop hypoglycemic attacks." Physically, Nawrot has already suffered early stages of kidney damage and nerve damage in his feet as a consequence of his diabetes. His nerve damage is so extensive that it has affected his ability to sense feeling in his feet. Furthermore, Nawrot is on a restrictive diet, and depression and mood changes accompany his swings in blood sugar level.

*Id.* at 904–05. The Seventh Circuit found that, on these facts, the plaintiff had established substantial limitation of the major life activities of caring for himself and thinking. *Id.* at 905.

In this case, the deposition testimony of the Plaintiff and his physicians clearly reveals that Thompson can do anything he is qualified and trained to do despite being a "brittle" diabetic. His diabetes does not even prevent him from playing golf, basketball, and running at least three miles every day. He has identified no daily tasks which he is substantially limited in

performing. Even though he reported "wide swings" in his blood sugar on "most days," he admits that monitoring his blood glucose and injecting insulin reduce extreme fluctuations. There is no indication of how often low or high blood sugar episodes actually result in the severe symptoms he describes, or if they are quickly resolved with glucose tablets or insulin. Nor is there evidence reflecting the frequency of severe symptoms occurring at work. Evidence has not been presented that the Plaintiff suffers any of the debilitating effects associated with diabetes beyond mild to moderate neuropathy that does not prevent him from feeling sensation in his feet. In addition, he does not test his blood sugar at least ten times per day as did the plaintiff in *Nawrot.* Thus, the Court finds that, based upon the information before it, the Plaintiff's occasional symptoms, which are uncomfortable and inconvenient, do not rise to the level of being substantially limiting for purposes of a finding that he is disabled. *See Palmer v. Albertson's, LLC,* No. 4:09–CV–00137–SPM–WCS, 2010 WL 785652, at *5 (N.D.Fla. Mar. 3, 2010) (plaintiff testified he "regularly performs cardiovascular and weight-lifting exercises and that he occasionally plays football, basketball, tennis, and golf" and physician noted virtually no restrictions on his ability to work; therefore, although diabetes had negative impact on plaintiff's life, he had failed to produce evidence condition substantially limited him in a major life activity); *Burrell,* 324 F.Supp.2d at 1013–14 ("The limitations Burrell is currently afflicted with—insulin dependence, constant blood sugars monitoring, and erratic changes during [low blood sugar] episodes—are certainly inconvenient and personally troublesome, but they do not rise to the level of a substantial limitation of a major life activi-

ty."). Based on the foregoing, the Defendant's motion for summary judgment as to the Plaintiff's claims under the ADA and the TDA is GRANTED.[6]

*State Law Retaliation Claim.*

The basis for federal jurisdiction in this matter was the existence of a federal question. When the federal claims in such a case are dismissed, the court may decline supplemental jurisdiction over any remaining state law claims. *See* 28 U.S.C. § 1367(c)(3). However, 28 U.S.C. § 1332(a)(1) imposes subject matter jurisdiction in the federal courts as to "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States ..." 28 U.S.C. § 1332(a)(1). "The general federal rule has long been to decide what the amount in controversy is from the complaint itself, unless it appears or is in some way shown that the amount in the complaint is not claimed in good faith." *Hudgins Moving & Storage Co., Inc. v. American Express Co.,* 292 F.Supp.2d 991, 996 (M.D.Tenn.2003) (quoting *Horton v. Liberty Mut. Ins. Co.,* 367 U.S. 348, 353, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961)) (internal quotation marks omitted). According to the complaint, as amended, the Plaintiff is a resident of Tennessee and the Defendant is a Massachusetts corporation. Thompson seeks a judgment in excess of $75,000. Accordingly, the Court's jurisdiction over the Plaintiff's retaliation claim under Tennessee law is appropriate.

In cases of common law retaliatory discharge in Tennessee, a plaintiff must establish (1) that an employment-at-will relationship existed; (2) that the employee suffered an adverse employment action; (3) that the reason for the adverse

---

**6.** In light of the Court's finding, it need not address UGL Unicco's remaining arguments in favor of summary judgment on the ADA and TDA claims.

action "was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision"; and (4) that "a substantial factor in the employer's decision to [take action against] the employee was the employee's exercise of protected rights or compliance with clear public policy." *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 781 (Tenn.2010) (citing *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn.2002)).

The Plaintiff asserts that, if he had been placed on temporary total disability status under the workers' compensation system or on FMLA leave on May 23, 2008, he would have returned to his first shift position after his foot healed. Since neither occurred, the argument goes, he suffered an adverse action when he was offered only the third shift job. While all this may be true, the Plaintiff has no retaliation claim. Under the third and fourth elements, a plaintiff must demonstrate his exercise of a statutory or constitutional right and that such exercise was a substantial factor in the adverse action taken by the defendant. *See id.* The Court has already found that the FMLA does not apply to the employer in this case. Although he could have filed a workers' compensation claim, the Plaintiff chose instead to do whatever would be best for the company, which Morris determined, and Thompson did not disagree, was to take a voluntary layoff. That the decision proved unwise when viewed in hindsight, at least for purposes of this lawsuit, cannot now form the basis for a retaliation claim against UGL Unicco. Moreover, with respect to the causation element of the retaliation cause of action, there is no allegation or evidence in the record that Thompson applied for workers' compensation benefits for the left foot problem prior to receiving the offer to work the third shift. Nor is

there any evidence beyond the barest of allegations that there was any relation whatever between the two events.

### CONCLUSION

For the reasons articulated herein, the motion for summary judgment is GRANTED and the Clerk is DIRECTED to enter judgment for the Defendant.